[No. S018909. Jan. 31, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT YOUNG, Defendant and Appellant.

1164

**COUNSEL**

Wesley A. Van Winkle, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b))[1] from a judgment of death under the 1978 death penalty law. Following a jury trial, defendant Robert Young was convicted of the first degree murder of Terry Rivers (§ 187, subd. (a), count 1); the robbery (§ 211, count 2) and attempted murder (§§ 187, 664, count 3) of Manzine Miller; the attempted robbery of Melva Fite (§§ 211, 664, count 4); the first degree murder of Glen Frazier (§ 187, subd. (a), count 5); the attempted murder of Luther Thomas (§§ 187, 664, count 6); the robbery of Gerald Livingston (§ 211, count 7); and the first degree murder of Sylvester Davis (§ 187, subd. (a), count 8). The jury also found true the robbery-murder special-circumstance allegations as to counts 1 and 5 (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)); the multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)); the personal use of a firearm allegation as to all counts (§§ 1203.06, 12202.5); and the great bodily injury allegations as to counts 2 and 3 (§§ 1203.075, 12022.7). The jury further found the robbery-murder special-circumstance (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)) and burglary-murder special-circumstance (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(G)) allegations as to count 8 not true.

In the penalty phase, the jury returned a verdict of death. After denying defendant's motion for a new trial and reduction of the penalty (§ 190.4), the trial court imposed the death penalty for the first degree murder convictions as to counts 1 and 5, followed by an indeterminate term of 25 years to life with possibility of parole for the murder conviction as to count 8. For the remaining counts and special circumstance allegations, the court imposed determinate terms totaling 45 years but ordered those sentences stayed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase*

#### 1. *The Attempted Murder and Robbery of Manzine Miller and the Murder of Terry Rivers*

In the early morning hours of January 30, 1989, Manzine Miller and Terry Rivers were selling rock cocaine in front of Miller's house on East 24th Street in Oakland (Miller's house). Around 2:30 a.m., Miller observed a black-over-green Ford turn onto Highland Avenue from East 24th Street and park. Moments later, defendant and another man walked from Highland Avenue and approached Miller. Defendant told Miller he wanted to purchase $50 worth of rock cocaine. Miller indicated to defendant that he could sell him the drug, but would have to get it from his supplier. Defendant told his companion to watch the street and then followed Miller along a pathway through a nearby vacant lot known as the "swamp," towards Miller's supplier. As they walked, defendant pulled out a gun, told Miller to get on his knees, and robbed him of the rock cocaine he had in his pocket. As Miller begged defendant not to shoot him, defendant shot him above his right hip. Miller survived the gunshot wound and watched defendant walk back towards his (Miller's) house. Miller heard three gunshots shortly after defendant left. When the police arrived at Miller's house, they found the body of Terry Rivers lying across the front entryway.

#### 2. *Murder of Glen Frazier and Attempted Robbery of Melva Fite*

Sometime after 2:00 a.m. on January 30, 1989, on 89th Avenue in Oakland, defendant exited a vehicle and approached Melva Fite and Glen Frazier as they talked with Frazier's cousin, Ricky Smith. Defendant suddenly began shooting at Smith. Smith ran to a house, and Fite and Frazier ran up 89th Avenue. Defendant followed Fite and Frazier in his vehicle. Defendant's cousin, Patrick Jackson, was riding in the front passenger seat. When defendant caught up with Fite and Frazier near the intersection of 90th Avenue and Cherry Street, he exited the vehicle and demanded their money. Frazier told defendant they did not have anything. Defendant then accused Frazier of previously robbing him. Frazier replied that he did not know defendant. As he and Fite crouched down on their knees, they begged defendant not to shoot. Defendant told Fite to run, and moments later, Fite heard two shots fired. She saw Frazier slump to the ground. Frazier died later that morning from a gunshot wound to his lower back.

### 3. *Murder of Sylvester Davis; Attempted Murder of Luther Thomas; Robbery of Gerald Livingston*

In the early morning hours of February 19, 1989, defendant crashed through the living room window of a "crack house" on 74th Avenue (74th Avenue house). Luther Thomas, Veronica Robinson, Joseph Lee Batiste,[2] Gerald Livingston, Veronica Hackett, and Sylvester Davis were present in the house. Defendant immediately began shooting at Thomas, the "doorman," as he ran towards the kitchen. Thomas suffered a gunshot wound to his forearm and escaped from the house.

During the commotion, Davis left the northwest bedroom and entered the southwest bedroom, where he jumped out of the window. Robinson, who had been hiding in the closet, followed Davis out of the window.

Meanwhile, defendant entered the northwest bedroom and robbed Livingston of $40. Defendant then left the bedroom and entered the southwest bedroom. Livingston heard the sound of a window breaking, followed by three gunshots. Within minutes after the shooting stopped, defendant entered the northwest bedroom, looked at Livingston, and then left the house through the front door.

Outside, Robinson had crawled toward the front of the house while Davis had crawled toward the rear of the house. Robinson heard Davis say, "Oh, they going to kill me" and another gunshot.

Shortly after defendant left the house, Livingston went to the front door and looked out. He saw defendant standing on the sidewalk and heard Davis moaning in pain. A vehicle pulled up in front of the house as Livingston went back into the house.

### 4. *Ballistics Evidence*

Chester Young, a retired ballistics expert formerly employed by the Oakland Police Department, analyzed six bullets recovered from the three crime scenes in this case: the three bullets recovered from each of the bodies of Miller, Rivers, and Frazier; a bullet recovered from the living room wall at Miller's house; and two bullets recovered from the 74th Avenue house.

Young explained to the jury that two bullets are declared "a positive match" when they share a particular number and type of identification

---

[2] Robinson and Thomas referred to Batiste as "J.L. Baptese" and "J.R. Baptese" throughout their testimony. To avoid confusion, we refer to him by the name provided in the police report regarding this incident.

characteristics. When the bullets do not share common identification characteristics, the presence of a "pseudo land impression," a very rare mark that is caused by a defect in the gun, very strongly suggests that the bullets were fired from the same gun. Based on his analyses, Young concluded that because all six bullets had one or two pseudo land impressions, there was a "very strong" likelihood that all of the bullets were fired from the same gun. That gun was never recovered.

### B. *Penalty Phase*

#### 1. *Prosecution Evidence*

As evidence in aggravation, the prosecution relied upon the guilt phase evidence of the circumstances of the charged offenses and special circumstances (§ 190.3, factor (a)), a prior conviction for the sale of narcotics that defendant admitted (§ 190.3, factor (c)), and evidence of other violent criminal conduct involving defendant's alleged battery and intimidation of witness Steven Ross on July 16, 1990 (§§ 190.3, factor (b), 136.1, 242).

#### 2. *Defense Evidence*

As evidence in mitigation, the defense presented the testimony of defendant's paternal grandmother and grandfather, mother, sister, aunt, three school teachers, and a licensed psychologist.

Family members testified that defendant's immediate family moved often when defendant was a child. Defendant grew up in Oakland but spent significant periods of time with his grandparents in Alabama. Defendant had "learning" and "adjustment" problems when he began kindergarten. By the time defendant was in the fourth grade, his problems had escalated into fighting and "disrespecting" authority.

Defendant's father moved out when defendant was eight years old, leaving defendant's mother with the sole responsibility of raising defendant and his siblings. Defendant had a good relationship with his siblings, but had essentially no relationship with his father. Defendant's mother sought psychiatric help for defendant when he was 11 years old because he was wetting his bed and soiling his underwear. Although she took defendant to see a psychiatrist, he would not cooperate with or speak to the psychiatrist.

Defendant started smoking marijuana in junior high school. When defendant dropped out of school in the ninth grade, he began to stay out all night with friends. At some point, defendant began to deal crack cocaine to make money.

Defendant performed below his grade level in elementary school. By age 15, defendant was reading at only a second or third grade level and solved math problems at the fourth or fifth grade level. Defendant failed in alternative school programs that were designed to get him back in the mainstream educational program at his junior high school. Defendant's aunt, Barbara Warren, a school librarian and creative writing teacher with the Oakland Unified School District, testified that defendant was of "average intelligence" but was not motivated. Warren also thought that defendant was "hyperkinetic," had a short attention span, and had possible learning disabilities.

Dr. Robert Kaufman, a licensed psychologist, testified as an expert in the area of neuropsychological testing and assessments. Dr. Kaufman met with defendant in the county jail on August 28, 1990, and administered a number of neuropsychological tests over a three-and-a-half-hour period. He testified defendant had an overall IQ of 75, just above the IQ range for the mentally retarded; was "highly impaired" in terms of cognitive dysfunction; had the educational skills of a nine year old; and suffered from a "probable organic mental disorder not otherwise specified."

## II. Discussion

### A. *Preliminary Issue: Adequacy of Appellate Record*

Defendant contends the record on appeal is inadequate to permit meaningful appellate review, in violation of his rights to due process of law under the Fifth and Fourteenth Amendments to the federal Constitution, to competent counsel under the Sixth Amendment, to equal protection of the law under the Fourteenth Amendment, and to a reliable determination of guilt and penalty under the Eighth Amendment.

The appellate record in this case does not include the reporter's transcripts of the following proceedings or conferences: defendant's arraignment in the Alameda County Superior Court; a portion of the jury selection proceedings; a conference between the trial court and counsel during which the trial court excused Prospective Juror H. H. by stipulation; two conferences between the trial court and counsel during which the parties agreed to excuse additional jurors by stipulation; a bench conference immediately preceding the testimony of prosecution witness Patrick Jackson; several conferences regarding jury instructions, penalty phase scheduling, and the readback of testimony; and a conversation between the trial court and the jury foreperson. The trial court conducted hearings to settle the record, but the parties were unable to fully reconstruct all of the unreported proceedings. Defendant claims the omission of these proceedings renders the record on appeal inadequate to permit meaningful appellate review.

A criminal defendant is entitled under the Eighth and Fourteenth Amendments to an appellate record that is adequate to permit meaningful review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *People v. Howard* (1992) 1 Cal.4th 1132, 1166 [5 Cal.Rptr.2d 268, 824 P.2d 1315] (*Howard*).) An appellate record is inadequate "only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal." (*Alvarez*, at p. 196, fn. 8.) The defendant bears the burden of demonstrating that the record is not adequate to permit meaningful appellate review. (*People v. Samayoa* (1997) 15 Cal.4th 795, 820 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Inconsequential inaccuracies or omissions are insufficient to demonstrate prejudice. (*Howard*, at p. 1165.) If the record can be reconstructed with other methods, such as "settled statement" procedures (see Cal. Rules of Court, rules 7, 32.3), the defendant must employ such methods to obtain appellate review (*People v. Hawthorne* (1992) 4 Cal.4th 43, 66 [14 Cal.Rptr.2d 133, 841 P.2d 118] (*Hawthorne*)).

Defendant fails to demonstrate prejudice. He argues the omissions from the record are prejudicial because legal discussions may have occurred during these proceedings and because reversible errors may have occurred that are forever shielded from appellate review. He adds that transcripts of these unreported proceedings are also crucial to determine whether trial counsel performed competently. In essence, defendant argues that merely showing that the missing material may have contained matter that demonstrated error or reflected a constitutional violation satisfies his burden of establishing prejudice. But this amounts to nothing more than speculation, which is insufficient. (*People v. Pinholster* (1992) 1 Cal.4th 865, 923 [4 Cal.Rptr.2d 765, 824 P.2d 571] (*Pinholster*).)

Because we find the appellate record adequate for us to reach the merits of defendant's claims, defendant was not prejudiced by the omission of portions of the record. (*People v. Frye* (1998) 18 Cal.4th 894, 941 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*).) For this reason, his constitutional claims must fail. (*Pinholster, supra*, 1 Cal.4th at pp. 919–923; *Howard, supra*, 1 Cal.4th at pp. 1165–1166.)

## B. *Guilt Phase Issues*

### 1. *Batson/Wheeler Motion*

Defendant contends that the trial court violated his state constitutional right to trial by a jury drawn from a representative cross-section of the community (Cal. Const., art. I, § 16; *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*)) when it found no prima facie case of discrimination by the prosecutor in the use of peremptory challenges to strike

prospective African-American female jurors.[3] For the first time on appeal, he also contends this asserted error violated his Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to equal protection of the laws. (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712].)

During jury selection, and after the prosecutor exercised his ninth peremptory challenge, defense counsel asserted that the prosecutor had used his peremptory challenges to strike all of the African-American female prospective jurors from the jury panel—namely, D. D., V. S., and B. W.[4] He added that two African-American male prospective jurors were seated on the panel. The trial court indicated it was not, at that time, finding a prima facie case of discrimination. Counsel then noted for the record that "all of the black women called into the jury box at this time have been excused by the prosecution."[5] The parties proceeded to use their remaining peremptory challenges and ultimately selected a jury and four alternates. Three African-American males were among the jurors selected.

Thereafter, out of the jury's presence, the trial court addressed defendant's *Wheeler* motion. It identified the African-American female prospective jurors by name (D. D. and V. S.), noted they were members of two cognizable

---

[3] With respect to his claims that the trial court erred in denying his *Wheeler* motion and the prosecutor committed misconduct during closing argument (see *post,* at pp. 1188–1198), defendant requests that we take judicial notice of "the transcripts, records, briefs, and evidence" in the following automatic appeals currently pending before this court: *People v. Schmeck,* S015008, *People v. Stanley,* S022224, and *People v. Tate,* S031641. Of course, we may take judicial notice of the "[r]ecords of . . . any court of this state." (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) However, " '[b]ecause . . . no evidence is admissible except relevant evidence, it is reasonable to hold that judicial notice, which is a substitute for formal proof of a matter by evidence, cannot be taken of any matter that is irrelevant . . . .' [Citation.]" (*People v. Rowland* (1992) 4 Cal.4th 238, 268, fn. 6 [14 Cal.Rptr.2d 377, 841 P.2d 897] (*Rowland*).) Here, defendant fails to establish the relevance of the requested records to our review of the trial court's ruling that he failed to establish a prima facie case of purposeful discrimination within the meaning of *Wheeler.* Similarly, he fails to show how the requested records are relevant to our determination of whether the prosecutor committed misconduct during closing argument. Consequently, we deny his request.

[4] Although defendant initially identified B. W. as one of the prospective jurors against whom the prosecutor discriminated, defendant now concedes that the prosecutor "may have had a legitimate basis for exercising a peremptory challenge" against this prospective juror given her apparent difficulty with accepting the testimony of drug users as credible evidence, and given many of the prosecution's percipient witnesses were drug users. Therefore, our analysis is limited to whether defendant stated a prima facie case of purposeful discrimination only as to Prospective Jurors D. D. and V. S.

[5] Counsel complains that the trial court ruled no prima facie case had been shown before he was permitted to argue the issue and further prevented him from making an adequate record on the issue. Our review of the record shows counsel, who was an experienced attorney, had adequate opportunity to put his arguments on the record.

groups, i.e., women and African-Americans, and then ruled that the defense had not made a prima facie case of discrimination.

■ Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias based on membership in a racial or other cognizable group. (*People v. Box* (2000) 23 Cal.4th 1153, 1187 [99 Cal.Rptr.2d 69, 5 P.3d 130] (*Box*); *Wheeler, supra,* 22 Cal.3d at pp. 276–277; *Batson v. Kentucky, supra,* 476 U.S. at p. 89.) Under *Wheeler* and *Batson,* "[i]f a defendant believes the prosecution is improperly using peremptory challenges for a discriminatory purpose, he or she must raise a timely objection and make a prima facie showing that jurors are being excluded on the basis of racial or group identity. [Citations.] To establish a prima facie case, the defendant should first make as complete a record as possible. [Citations.] Second, the defendant must establish that the persons excluded are members of a cognizable group. [Citations.] Third, the defendant must show a strong likelihood or reasonable inference that such persons are being challenged because of their group association. [Citations.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 134–135 [121 Cal.Rptr.2d 106, 47 P.3d 988] (*Farnam*).) We have held that to establish a " 'strong likelihood' " or raise a " 'reasonable inference,' " the defendant must show that the prosecutor's peremptory challenges, if unexplained, were "more likely than not" based on impermissible group bias. (*People v. Johnson* (2003) 30 Cal.4th 1302, 1306, 1312–1318 [1 Cal.Rptr.3d 1, 71 P.3d 270], cert. granted *sub. nom. Johnson v. California* (2003) 540 U.S. 1045 [157 L.Ed.2d 692, 124 S.Ct. 817], cert. dismissed for lack of final state court judgment (2004) 541 U.S. 428 [158 L.Ed.2d 696, 124 S.Ct. 1833].)[6]

■ When a trial court denies a *Wheeler* motion because the movant failed to establish a prima facie case of group bias, the reviewing court examines the entire record of voir dire for evidence to support the trial court's ruling.[7] (*Farnam, supra,* 28 Cal.4th at p. 135.) The ruling is affirmed if the record "suggests grounds upon which the prosecutor might reasonably

---

[6] The United States Supreme Court has once again granted certiorari in *Johnson* following final judgment in the First Appellate District, to decide whether this standard complies with *Batson v. Kentucky, supra,* 476 U.S. 79. (*Johnson v. California, supra,* 540 U.S. 1045 [160 L.Ed.2d 610, 125 S.Ct. 824].) As we held in similar circumstances in *People v. Cleveland* (2004) 32 Cal.4th 704, 732, footnote 5 [11 Cal.Rptr.3d 236, 86 P.3d 302], "[t]he exact test is not critical to our resolution of this case. The facts here do not give rise to any reasonable 'inference of discriminatory purpose.' (*Batson v. Kentucky, supra,* at p. 93.)"

[7] Defendant asserts that he satisfied the requirement for stating a prima facie case because he established the prosecutor removed "most or all of the members of the identified group" and, according to defendant, this is all that is required under *Wheeler, supra,* 22 Cal.3d at p. 280. Defendant misreads *Wheeler.*

In *Wheeler,* "[w]e discussed types of evidence the objector may present to make [a prima facie case of discrimination]. '[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of

have challenged the jurors in question." (*Ibid.*) If the reviewing court concludes the trial court properly determined no prima facie case was made, it need not review the adequacy of the prosecutor's justifications, if any, for the peremptory challenges. (*Ibid.*)

■ "Blacks, of course, are a cognizable group for purposes of both *Wheeler* (22 Cal.3d at p. 280, fn. 26) and *Batson* (476 U.S. at pp. 84–89)." (*People v. Clair* (1992) 2 Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705] (*Clair*).) While this court has held further that Black women are a cognizable group for purposes of *Wheeler/Batson* analysis (see *ibid.*; *People v. Boyette* (2002) 29 Cal.4th 381, 422 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Motton* (1985) 39 Cal.3d 596, 605–606 [217 Cal.Rptr. 416, 704 P.2d 176]), here we conclude the record suggests grounds on which the prosecutor reasonably might have challenged Prospective Jurors D. D. and V. S.

---

his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. . . .' [¶] We then discussed what the court must do. 'Upon presentation of this and similar evidence—in the absence, of course, of the jury—*the court must determine whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone.*' " (*People v. Johnson, supra,* 30 Cal.4th at pp. 1309–1310, italics added, quoting *Wheeler, supra,* 22 Cal.3d at pp. 281–282.)

"Indeed, we have emphasized that such rulings require trial judges to consider '*all the circumstances of the case.*' " (*Howard, supra,* 1 Cal.4th at p. 1155, quoting *Wheeler, supra,* 22 Cal.3d at p. 280, italics added.) Trial judges " 'are in a good position to make such determinations . . . on the basis of their knowledge of local conditions and of local prosecutors.' [Citation.] They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience." (*Wheeler, supra,* 22 Cal.3d at p. 281.)

Nothing in *Wheeler* suggests that the removal of all members of a cognizable group, standing alone, is dispositive on the question of whether defendant has established a prima facie case of discrimination. (See, e.g., *People v. Johnson, supra,* 30 Cal.4th at pp. 1325–1326 [the removal of all three African-American prospective jurors did not present a prima facie case of discrimination]; *People v. Crittenden* (1994) 9 Cal.4th 83, 119 [36 Cal.Rptr.2d 474, 885 P.2d 887] [the excusal of all members of a cognizable group may give rise to an inference of impropriety but is not dispositive of whether defendant has shown purposeful discrimination]; *Howard, supra,* 1 Cal.4th at pp. 1154–1155 [the defendant relied solely on the fact that the prosecutor challenged the only two African-American prospective jurors and made no effort to set out other relevant circumstances; such a showing was "completely inadequate"]; *People v. Sanders* (1990) 51 Cal.3d 471, 500 [273 Cal.Rptr. 537, 797 P.2d 561] [the removal of all members of a cognizable group is not dispositive on the question of whether a prima facie case has been shown]; *People v. Rousseau* (1982) 129 Cal.App.3d 526, 536 [179 Cal.Rptr. 892] [the defendant's prima facie showing was limited to his statement that " 'there were only two blacks on the whole panel, and they were both challenged by the district attorney' "; this "statement was not a prima facie showing of systematic exclusion"].)

During voir dire, D. D. revealed that she worked as a therapist and had testified for the prosecution as an expert in a sexual assault case. The prosecutor in this case may have reasonably believed that D. D. would have difficulty setting aside her expertise as a therapist in evaluating the evidence in this case. In addition, the prosecutor reminded D. D. that the penalty phase might involve evidence pertaining to whether extreme mental disturbance or emotional illness was a factor in the case and informed her that a psychologist or psychiatrist might be called to testify on the topic. He then asked a question which, in his own words, was aimed at ascertaining the possibility of "actual bias" on D. D.'s part with respect to any diligent cross-examination he might conduct. Even though D. D. gave assurances she harbored no biases or opinions that would affect her ability to be open-minded and fair, the prosecutor might have reasonably exercised a challenge to excuse D. D. on this basis. Finally, the prosecutor may have reasonably been concerned about D. D.'s apparently negative view of the government—that is, her stated belief that crime had increased, in part, because of an "increase in the double standard of our government[] system."

Regarding Prospective Juror V. S., the prosecutor reasonably might have challenged her because of her experience as an insurance claims specialist. V. S. disclosed she assisted defense attorneys in preparation for litigation and arbitration. In response to questioning, she indicated she sometimes took an active role in the process. Although V. S. stated she might not speak up in settlement conferences or negotiations "[i]f our defense attorney is a strong attorney and he doesn't need my input," she said she would "have something to say" if the attorney "doesn't put forth something that I think is essential to evaluating the claim and helping the judge make a decision as to, you know, what is fair or in helping the judge." In light of these voir dire responses, the prosecutor might reasonably have challenged V. S. on the basis that she might be overly defense oriented in evaluating and deliberating the charges against defendant.

Accordingly, we affirm the trial court's ruling denying defendant's *Wheeler* motion.

Furthermore, even though the trial court interpreted defendant's motion as based solely on *Wheeler*, we may properly consider defendant's *Batson* claim on the merits. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166] (*Yeoman*) [claim is not waived on appeal when the state and federal standards and the factual inquiry are essentially the same].) Accordingly, it lacks merit for the same reasons as his *Wheeler* claim.

## 2. *Sufficiency of Evidence as to the Murder of Terry Rivers*

Defendant was convicted of the first degree murder of Terry Rivers. The jury was instructed it could convict defendant of first degree murder based on the theory of robbery felony murder or of premeditated and deliberate murder. Because the jury found true the special circumstance that defendant killed Rivers during the commission of a robbery, it necessarily sustained at least the felony-murder theory. Defendant contends, in substance, the evidence is insufficient under the due process clause of the Fourteenth Amendment to the federal Constitution to support his conviction for the first degree murder of Terry Rivers under either theory.

■ "In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*Rowland, supra,* 4 Cal.4th at p. 269, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) We apply an identical standard under the California Constitution. (*Ibid.*) "In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) The same standard also applies in cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

■ "In California, the first degree felony-murder rule 'is a creature of statute.' [Citation.] When the prosecution establishes that a defendant killed while committing one of the felonies section 189 lists [including robbery], 'by operation of the statute the killing is deemed to be first degree murder as a matter of law.' " (*People v. Mendoza* (2000) 23 Cal.4th 896, 908 [98 Cal.Rptr.2d 431, 4 P.3d 265].) Under the felony-murder rule, a strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the felony and murder were part of one continuous transaction. (*People v. Cavitt* (2004) 33 Cal.4th 187, 207 [14 Cal.Rptr.3d 281, 91 P.3d 222].) This transaction may include a defendant's flight after the felony to a place of temporary safety. (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1015–1016 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People v. Portillo* (2003) 107 Cal.App.4th 834, 846 [132 Cal.Rptr.2d 435].)

Defendant contends the evidence is insufficient to support his first degree murder conviction of Rivers under a robbery-felony-murder theory because it fails to establish he killed Rivers during the commission of the Miller robbery. Under the foregoing standard, and viewing the evidence in the light most favorable to the judgment, a rational trier of fact could have concluded that defendant robbed and shot Miller and then killed Rivers before completing the Miller robbery.

Miller testified defendant robbed and then shot him around 2:30 a.m. on January 30, 1989. Defense counsel conceded during summation that defendant shot Miller and, on appeal, defendant concedes the evidence is sufficient to prove he shot Miller.

Miller testified that after defendant shot him, defendant walked back towards Miller's house. Miller heard three additional shots fired, from several seconds to 10 minutes later. He then began crawling towards East 23rd Street to get help.

Police discovered Rivers's body lying on the front porch of Miller's house, across the front entryway. Rivers was killed by a single .38-caliber bullet to the back of his head. A dozen small white rocks were found next to Rivers's body. A second .38-caliber bullet was removed from a living room wall in Miller's house. Police did not find a third bullet that had penetrated a door to the front porch. A police evidence technician estimated the distance between Miller's house and the area where defendant shot Miller to be 120 to 150 feet.[8]

From these circumstances, a trier of fact could reasonably infer that defendant shot and killed Rivers. The ballistics evidence solidified this conclusion. The prosecution's ballistics expert opined that, based on the presence of one or two rare "pseudo land impressions" on each of the bullets he examined, including the one taken from Miller's body, the one taken from Rivers's body, and the one taken from Miller's living room wall, all of the bullets were fired from the same gun.

Defendant contends further that even if there existed sufficient evidence that he killed Rivers, the evidence is insufficient to establish the murder occurred during the commission of the Miller robbery.

We disagree. First, the evidence demonstrates overwhelmingly that defendant robbed Miller—that is, defendant took property from Miller by means of force or fear with the specific intent to permanently deprive him of that

---

[8] Miller estimated this distance to be "a good 500 or 600 feet."

property. (§ 211.) Second, a rational trier of fact could have found the Miller robbery was not complete when defendant shot and killed Rivers.

A robbery is not complete until the perpetrator reaches a place of temporary safety (*People v. Salas* (1972) 7 Cal.3d 812, 822 [103 Cal.Rptr. 431, 500 P.2d 7]), and the jury here was so instructed.[9] Miller testified Rivers had been "fandangling," i.e., selling fake drugs, in front of the house and may have been outside at the time he left with defendant and headed towards the "swamp" to buy some cocaine from one of his suppliers. The jury thus could have reasonably inferred that defendant killed Rivers in order to eliminate a potential witness against him in a prosecution for the robbery and attempted murder of Miller. (See *People v. Fields* (1983) 35 Cal.3d 329, 365–368 [197 Cal.Rptr. 803, 673 P.2d 680].) In addition, because "[t]he scene of a robbery is not a place of temporary safety . . ." (*People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1375 [46 Cal.Rptr.2d 530]), the jury reasonably could have found that the robbery was not yet complete at the front of Miller's house at 2:30 a.m., approximately 120 to 150 feet from the "swamp" where defendant had robbed Miller moments before.

Accordingly, the record contains sufficient evidence that defendant shot and killed Rivers during the commission of a robbery, and thus committed first degree murder under the theory of robbery felony murder.

Defendant additionally claims the lack of sufficient evidence to support his conviction for first degree murder based on a theory of felony murder also violated his right to a reliable penalty determination under the Eighth Amendment to the United States Constitution. The point is without merit, given we have concluded there was substantial evidence to support his conviction on a felony-murder theory.

Finally, defendant contends that, even if the evidence was sufficient to identify him as the shooter, it nevertheless was insufficient to support his conviction for the first degree murder of Rivers based on a theory of premeditation and deliberation. But because we have concluded defendant's first degree murder conviction is adequately supported under the theory of

---

[9] The trial court instructed the jury as follows:

"The commission of the crime of robbery is not confined to a fixed place or a limited period of time.

"A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape. Likewise, it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain the stolen property.

"A robbery is complete when the perpetrator has alluded [*sic*] any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with the property."

robbery felony murder and the jury found true the robbery-murder special circumstance, we need not address this point. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1086 [25 Cal.Rptr.2d 867, 864 P.2d 40] (*Berryman*), overruled on another point by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673] (*Hill*).)

### 3. *Sufficiency of Evidence as to the Murder of Sylvester Davis*

The jury found that defendant personally used a handgun during the commission of the offense, but did not find true the robbery-felony-murder or burglary-felony-murder special-circumstance allegations, thus implicitly finding that the Davis killing was premeditated and deliberate first degree murder. Defendant contends that the evidence is insufficient to support his conviction on this theory.

In order to address defendant's contention, we must set forth the facts at some length. In early 1989, Thomas lived in a room that he rented from Joseph Batiste at the 74th Avenue house in Oakland. The house was a single-story structure with a living room and garage in the front, a kitchen to one side, and a central hallway that led to two bedrooms in the rear. A small concrete porch extended from the front door to the large living room window. Crack cocaine was regularly bought, sold, and used at the house, characterized by one regular visitor as a "smoke house."

On February 19, 1989, shortly after 2:00 a.m., Thomas was in the living room watching television. Batiste, Livingston, Davis, Hackett, and Robinson were also in the house: Livingston and Davis in the northwest bedroom smoking cocaine, Batiste and Robinson in the southwest bedroom, and Hackett in the kitchen.

Steve Ross, who lived next door, came over to the house and briefly visited with Batiste. After Ross left, Thomas watched through a crack in the open front door and saw Ross speaking with defendant, who had just walked up the street. As Ross and defendant talked, Ross pointed to the house, and defendant looked over his shoulder in Thomas's direction. After Ross and defendant started walking up the street, Thomas shut the door and continued to watch them through the peephole in the door. When Thomas saw Ross walking towards the house next door, he resumed watching television.

Moments later, defendant knocked on the front door of the 74th Avenue house. Because Thomas did not recognize the name defendant gave, he looked out the peephole. Thomas saw defendant and asked again for defendant's name. When he still failed to recognize the name, Thomas called for Batiste and again looked out the peephole. Defendant had put his own eye up

to the peephole and looked in. He then rattled the doorknob, took a half-step backwards, and walked towards the living room window.

Thomas stepped back from the door and heard a loud crash in the living room. He turned and ran towards the kitchen. As he did so, he saw the top of defendant's Yankees baseball cap and an arm with a pistol in the hand come through the window. Defendant shot Thomas through his right forearm as he ran. Thomas continued to run and eventually escaped the house through the garage door.[10]

In the northwest bedroom, Davis and Livingston heard loud banging and then two gunshots. Upon hearing the shots, Davis ran out of the bedroom and into the southwest bedroom where he jumped out of the window. Robinson, who was hiding in the closet, followed.

Livingston, meanwhile, had remained in the northwest bedroom. Defendant suddenly kicked open the bedroom door, brandishing a long-barreled black revolver with a brown handle. Defendant told Livingston to "give me your damn money." Livingston reached into his wallet and handed him two $20 bills. Defendant took the money and walked into the southwest bedroom. Livingston then heard the sound of a window breaking and three gunshots. After the shooting stopped, Livingston stayed in the northwest bedroom for two or three minutes. Defendant returned, looked at Livingston, and walked out of the house through the front door.

Outside the southwest bedroom window, Robinson had crawled to the south side of the house toward the front. Davis had run to the north side. Robinson heard Davis say, "Oh, they going to kill me," and then another gunshot.

About a minute after defendant left the house, Livingston walked to the front door and looked outside. Livingston heard Davis "hollering" as if he were "in a lot of pain." Livingston retreated into the house as a dark four-door car pulled in front.

After Robinson had crawled past three or four houses, she was assaulted by someone matching defendant's description who hit her in the head with his gun. The man told Robinson not to return to the 74th Avenue house "because it was his turf."

Police discovered Davis's body lying in the front yard of the house next door. A trail of blood led from the intersection of the fences at the rear of the

---

[10] Thomas testified that he had never seen defendant in the house before February 19, 1989, but might have seen him previously dealing drugs in the neighborhood.

house and along the side to where Davis's body was found. The bullet that struck Thomas was found lodged in the refrigerator and was either a .38-caliber or .357-magnum lead bullet. A second shot, a .38-caliber lead bullet, was found in the hallway. A .32-caliber cartridge was found on a dresser in the southwest bedroom. The bullet that struck and killed Davis was never recovered.

Thomas described the man who spoke with Ross and later knocked on the front door as being in his early 20's, between five feet six inches and five feet eight inches tall, and approximately 155 pounds. He wore a dark three-quarter-length coat with a hood and a New York Yankees cap. Livingston described the man who robbed him as about six feet tall and wearing a dark knit navy watch cap, black waist-length "Members Only" jacket, and red shirt. Robinson described the man who assaulted her as African-American, five feet nine inches tall, between 26 and 29 years old, and wearing a black leather coat and a baseball cap.

As stated, in reviewing a challenge to the sufficiency of the evidence, the relevant inquiry is whether, on review of the entire record in the light most favorable to the judgment, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. (*Rowland, supra,* 4 Cal.4th at p. 269; see also *Jackson v. Virginia, supra,* 443 U.S. at pp. 317–320.)

Applying this standard, we conclude the above evidence constituted sufficient proof that defendant shot and killed Davis. The jury reasonably could have found that defendant (1) broke into the 74th Avenue house, (2) shot Thomas as he fled to the kitchen, then (3) robbed Livingston in the northwest bedroom, and (4) pursued and shot Davis after he jumped through the southwest bedroom window.

The testimony of the prosecution's ballistics expert bolsters this conclusion. The expert testified that the bullet taken from Frazier—whom the evidence overwhelmingly proved defendant shot and killed on January 30, 1989—and the bullet taken from the hallway at the 74th Avenue house were "likely" fired from the same gun. The expert also formed the "very, very strong" opinion that the Frazier bullet and the bullet recovered from the refrigerator at the same house were fired from the same gun. Thus, the expert's ballistics testimony strongly suggests that the gun used to kill Frazier was used to shoot Thomas at the 74th Avenue house. Because the evidence proved overwhelmingly that defendant had shot and killed Frazier approximately three weeks before, the jury could reasonably conclude that Thomas's identification of defendant as his assailant was reliable. It follows that, given the jury also found defendant shot at Thomas and attempted to murder him, it reasonably could conclude that defendant also shot and killed Davis.

Defendant asserts the jury could not reasonably believe that he shot Davis because Livingston and Thomas described different assailants. He acknowledges that both identified defendant at trial but argues nonetheless that their conflicting descriptions and other evidence suggest that at least two gunmen were in the house that night.

In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. (*People v. Maury*, *supra*, 30 Cal.4th at p. 403.) Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. (*Ibid.*) Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. (*People v. Allen* (1985) 165 Cal.App.3d 616, 623 [211 Cal.Rptr. 837].)

No inherent improbability appears in the identification testimony of either Livingston or Thomas, and nothing about the evidence shows the Davis murder would have been physically impossible for defendant to perpetrate. The jury, as the sole judge of the credibility of witnesses, could reasonably have rejected defendant's theory of two gunmen storming the house and instead accepted the prosecutor's argument that Livingston's description of the perpetrator's height and clothing was simply inaccurate. In addition, given the chaos prevailing at the 74th Avenue house in the early morning hours on February 19, 1989, conflicting descriptions would not be particularly surprising. Importantly, though, both witnesses identified defendant at trial as their assailant and identified the jacket worn by defendant on the day of his arrest as similar to the one the perpetrator wore.

Defendant's reliance on *People v. Blakeslee* (1969) 2 Cal.App.3d 831 [82 Cal.Rptr. 839], is misplaced. In *Blakeslee*, the court reversed the defendant's conviction for the second degree murder of her mother based on insufficient evidence. (*Id.* at pp. 837–840.) The evidence established only that the defendant had an opportunity to commit the murder, had previously but not recently quarreled with her mother, had access to her brother's .22-caliber rifle, which was kept in his bedroom at the home they shared, and had given the police a false alibi. (*Id.* at pp. 835, 837–839.) The coroner's testimony established that the victim's wounds were consistent with those that would have been made by .22-caliber rifle bullets, but the bullets recovered from the body could not be used to identify the gun from which they were fired. (*Id.* at p. 835.) The court noted that it could draw an almost equally plausible case against the defendant's brother. (*Id.* at p. 840.)

In holding the evidence insufficient to prove the defendant committed the murder, the court in *Blakeslee* expressed particular concern with "the absence of evidence we would normally expect to find in a murder prosecution based

on circumstantial evidence." (*People v. Blakeslee, supra*, 2 Cal.App.3d at p. 839.) This *absent* evidence included: "(1) evidence of a murder weapon . . . ; (2) evidence linking the bullets which caused the victim's death to a particular weapon . . . ; (3) in the absence of the first two items, evidence of the type or caliber of weapon used for the murder . . . ; (4) evidence to establish a connection between a murder weapon and the defendant, either tangible evidence such as fingerprints, palm prints, or powder burns, or testimonial evidence linking the defendant in some manner to a weapon . . . ." (*Id.* at p. 840.)

Here, contrary to defendant's assertions, there was no lack of evidence regarding the Davis murder. Livingston and Thomas identified defendant as their armed assailant. Although the gun defendant used was not recovered, Livingston described it as a long-barreled black revolver with a brown handle. Jackson testified that defendant possessed a dark revolver with a brown handle and a four- or five-inch barrel when he shot Frazier. And based on the ballistics expert's conclusions, the gun used to shoot Thomas just moments before Davis was shot was the same gun that fired a bullet into the hallway that led to the bedroom from which Davis fled. Livingston testified that he saw defendant enter the southwest bedroom before he heard three shots fired. He also testified that after defendant emerged from the southwest bedroom and left the house through the front door, he heard Davis outside "hollering" in pain. Livingston then observed defendant on the sidewalk in front of the house, staring at Livingston and to the rear of the house. Thus, unlike the evidence in *Blakeslee*, sufficient physical and circumstantial evidence linked defendant to the Davis murder.

Defendant contends that even if the evidence is sufficient to prove beyond a reasonable doubt that defendant killed Davis, there is no evidence to establish the killing was premeditated and deliberate and thus, first degree murder. We disagree.

■ "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. . . . 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335] (*Koontz*).)

■ In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942] (*Anderson*), this court surveyed prior cases and developed

guidelines to aid reviewing courts in assessing the sufficiency of the evidence to sustain findings of premeditation and deliberation. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) The court identified three categories of evidence pertinent to this analysis: planning, motive, and manner of killing. (*Ibid.*, citing *Anderson*, at p. 27.) With respect to these categories, the *Anderson* court stated: " 'Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing].' " (*Perez*, at p. 1117, quoting *Anderson*, at p. 27.)

The *Anderson* guidelines are "descriptive, not normative," and reflect the court's attempt "to do no more than catalog common factors that had occurred in prior cases." (*People v. Perez, supra,* 2 Cal.4th at p. 1125.) In developing these guidelines, the court did not redefine the requirements for proving premeditation and deliberation. (*People v. Welch* (1999) 20 Cal.4th 701, 758 [85 Cal.Rptr.2d 203, 976 P.2d 754] (*Welch*).) The categories of evidence identified in *Anderson*, moreover, do not represent an exhaustive list of evidence that could sustain a finding of premeditation and deliberation, and the reviewing court need not accord them any particular weight. (*Perez*, at p. 1125; *People v. Sanchez* (1995) 12 Cal.4th 1, 33 [47 Cal.Rptr.2d 843, 906 P.2d 1129].)

Applying these guidelines, we find substantial evidence supports the jury's finding that defendant premeditated and deliberated the Davis murder. Shortly before it occurred, defendant was talking with Ross in front of the 74th Avenue house. As they talked, Ross pointed to the house, and defendant looked in the direction of Thomas, who was standing in the front doorway. A short time later, defendant knocked on the front door of the house. When asked for his name, defendant gave a name that Thomas did not recognize. Defendant then put his eye up to the peephole and rattled the door handle. He stepped back and walked along the porch towards the living room window. Moments later, defendant crashed through the living room window armed with a pistol. Thus, as defendant concedes, the evidence established defendant planned his entry into the house.

Defendant contends the mere fact of a planned entry, standing alone, is inconsequential because it does not establish premeditation and deliberation of a murder committed *outside* the home. Defendant, however, executed his planned entry into the house with a loaded gun in his hand. Hence, the jury could infer that defendant "considered the possibility of murder in advance" and intended to kill. (*People v. Miller* (1990) 50 Cal.3d 954, 993 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People v. Miranda* (1987) 44 Cal.3d 57, 87 [241 Cal.Rptr. 594, 744 P.2d 1127].)

The jury could further infer from the evidence defendant's motive and a premeditated and deliberate manner of killing. The jury could reasonably conclude that defendant's killings over this period showed a distinct pattern. He accosted Miller, Rivers, Frazier, Fite, and Smith while in possession of a loaded gun. He killed Rivers and Frazier and wounded Miller. He demanded money or contraband, but the point of this rampage seemed to be to intimidate his victims and to convince the survivors of his seriousness. The Davis murder fit the same pattern. Defendant went to the crack house armed with a gun. When the door remained barred, he smashed a window to get inside. He shot Thomas and took money from Livingston at gunpoint. He tracked Davis down when he made a desperate attempt to escape and cold-bloodedly executed him. Someone matching defendant's description pointed a gun at Robinson's back and told her not to go near the crack house again because "it was his turf." The jury could reasonably infer that this was defendant's motive and that, like the other incidents, it showed a premeditated and deliberate killing—even if the specific victim was selected more or less at random.

In sum, substantial evidence supports the jury's verdict that defendant committed the premeditated and deliberate first degree murder of Davis.

Defendant further contends the insufficiency of evidence to support his conviction for first degree murder based on a theory of premeditation and deliberation violated his right to a reliable sentence under the Eighth Amendment to the United States Constitution. Because we have concluded substantial evidence supported his conviction on such a theory, the point is without merit.

### 4. Alleged Prosecutorial Misconduct

██ Defendant contends the prosecutor engaged in numerous acts of misconduct. A prosecutor's conduct violates the federal Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under [California] law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*Morales*, at p. 44.) ██ In general, " ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—

and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 284 [96 Cal.Rptr.2d 682, 1 P.3d 3] (*Ayala*).)

Defendant additionally contends the asserted instances of prosecutorial misconduct violated his rights to an impartial jury under the Sixth Amendment and to due process of law under the Fourteenth Amendment and rendered his sentence unreliable under the Eighth Amendment. Assuming the above federal constitutional claims were properly preserved for review (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133) for each asserted instance of misconduct,[11] they are without merit because we have concluded either no misconduct occurred or any misconduct was harmless.

a) *References to Uncharged Homicides and the Valente Bullet*

Defendant complains the prosecutor improperly implied defendant had committed uncharged homicides during his direct examination of Jackson, defendant's cousin. Jackson testified that shortly after defendant shot Frazier, defendant told Jackson he did so because Frazier had robbed him earlier. The prosecutor asked, "Aside from what you have testified here as to witnessing, did the defendant, your cousin, tell you that he had killed other people?" Defense counsel objected on relevance grounds. The trial court overruled the objection, and Jackson answered, "No." The prosecutor then asked, "Did you tell the police on March 13th of 1989 that your cousin had told you of other killings?"

During a conference held outside the jury's presence, defense counsel objected to the prosecutor's questions on the ground of irrelevance because there was no evidence defendant was involved in either the Rivers or Davis murders or any other uncharged killings. The prosecutor explained he intended to ascertain only whether defendant told Jackson about the Rivers or Davis murders, and that the factual basis of his question was the transcript of an interview of Jackson by Sergeants Brian Thiem and Ramon Paniagua. The transcript, however, indicated only that the police officers asked Jackson if defendant told him of any other "shootings" and that Jackson responded, "Uh-huh." When Sergeant Thiem then asked Jackson what defendant said about other shootings, Jackson declined to discuss the matter further. The trial court indicated it was unsure whether there was a factual basis for the prosecutor's question, because Jackson was questioned only about other

---

[11] That is, assuming defendant objected to the instance of misconduct at trial and the state and federal standards and the factual inquiry are essentially the same. (*People v. Yeoman, supra,* 31 Cal.4th at pp. 117–118.)

*shootings,* not other *killings,* and then sustained defense counsel's relevance objection on that ground. The trial court granted defense counsel's subsequent request to strike any references to "any other shootings," instead of "killings," and admonished the jury to "disregard any other reference to any other shootings," again instead of "killings."

Contrary to respondent's assertion, we believe defendant has preserved his claim of prosecutorial misconduct for review. Although he did not request an assignment of misconduct or an admonition that the jury disregard the impropriety, through his relevance objection he gave the trial court an opportunity to correct the asserted abuse—an opportunity the court took advantage of by striking any references to "any other shootings" and admonishing the jury to "disregard any other reference to any other shootings."

■ Although preserved for review, defendant's claim of prosecutorial misconduct nonetheless fails on the merits. It is well established that a prosecutor may not " 'ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 562 [127 Cal.Rptr.2d 802, 58 P.3d 931].) In other words, "a prosecutor may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed." (*People v. Visciotti* (1992) 2 Cal.4th 1, 52 [5 Cal.Rptr.2d 495, 825 P.2d 388].) Here, contrary to defendant's assertion, the trial court did not find the prosecutor lacked a good faith belief for his question regarding other killings defendant may have mentioned to Jackson; instead, the court concluded it was unsure whether there was a factual basis for the question. Further, the circumstance that the prosecutor failed to distinguish between "other shootings" and "other killings" in his question to Jackson is unremarkable in this case because each of the three murder victims—Rivers, Frazier, and Davis—was killed in a shooting. We therefore conclude the prosecutor's question about other killings was not improper.

Consequently, *People v. Wagner* (1975) 13 Cal.3d 612 [119 Cal.Rptr. 457, 532 P.2d 105], and *People v. Evans* (1952) 39 Cal.2d 242 [246 P.2d 636], upon which defendant relies, are distinguishable. In *Wagner,* the prosecutor failed to make an offer of proof or to introduce any evidence to substantiate the implications from his questions that the defendant, who was charged with selling marijuana, had been involved in extensive drug sales. (*Wagner,* at pp. 616–619.) In *Evans,* the prosecutor, without any evidentiary support, improperly asked the defendant a series of questions insinuating the defendant accosted and molested a girl in a park. (*Evans,* at pp. 247–249.) In contrast, here, the prosecutor's question about other killings was based on information contained in the transcript of Jackson's interview.

Defendant next complains that during the direct examination of the People's ballistics expert, the prosecutor improperly insinuated a second time that he had committed uncharged homicides. The expert testified regarding his comparison of the bullet recovered from Frazier's body with bullets recovered from the 74th Avenue house. The prosecutor then asked the expert whether he had received a "request from homicide" to examine other bullets. The expert responded that he retrieved four bullets from the property room, identifying them as the "Rivers," "Frazier," "Miller," and "Valente" bullets. When the prosecutor began to question the expert specifically regarding his examination of the Valente bullet, defense counsel objected to the question as follows: "If it please the court, it has no relevance." The prosecutor interjected, "That is why we are getting rid of it right now." The prosecutor and defense counsel ultimately stipulated the Valente bullet had different characteristics and was not related to this case or to defendant, and this stipulation was read to the jury.

Assuming the contention was preserved for appellate review, any misconduct was harmless given the stipulation that the Valente bullet had nothing to do with defendant's case.

b) *Miller's "No Remorse" Response*

Defendant contends the prosecutor engaged in misconduct by intentionally eliciting inadmissible and prejudicial testimony from prosecution witness Manzine Miller. He further complains this misconduct constituted error under *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], by implying, contrary to his Fifth Amendment privilege against compelled self-incrimination, that defendant's failure to testify supported an inference of guilt.

At the conclusion of the prosecutor's redirect examination of Miller, the prosecutor asked, "Is there any doubt in your mind that the defendant shot you?" Miller answered, "There's no doubt. He still has that same look when he did shoot me, no remorse whatsoever." Defense counsel objected that the response was "purposely conclusionary on the part of the witness" and moved that the response be stricken. The trial court overruled counsel's objection and effectively denied the motion to strike.

We reject defendant's claim of prosecutorial misconduct at the threshold because he failed to request an assignment of misconduct or an admonition that the jury disregard the impropriety on the ground now asserted. (*Ayala, supra,* 23 Cal.4th at p. 284.)

We also reject the claim on the merits. A prosecutor engages in misconduct by deliberately eliciting inadmissible testimony. (*People v. Valdez*

(2004) 32 Cal.4th 73, 125 [8 Cal.Rptr.3d 271, 82 P.3d 296] (*Valdez*).) Here, no such misconduct occurred. Miller's "no remorse" remark was nonresponsive. Further, there is no reasonable likelihood that the jury would have understood Miller's response as referring to defendant's failure to testify. (See *Clair, supra,* 2 Cal.4th at pp. 662–663, citing *Griffin v. California, supra,* 380 U.S. at pp. 611–615.) Thus, no *Griffin* error occurred.

### c) *The Prosecutor's Closing Argument*

Defendant claims the prosecutor engaged in numerous acts of misconduct during closing arguments in the guilt phase. Except as noted below, defense counsel failed to request an assignment of misconduct or an admonition, or both, as to each asserted claim of misconduct. Defendant concedes we have held that, in general, failure to request an assignment of misconduct and an admonition forfeits a claim of prosecutorial misconduct on appeal unless an objection or request for admonition would have been futile or an admonition would not have cured the harm. (*People v. McDermott* (2002) 28 Cal.4th 946, 1001 [123 Cal.Rptr.2d 654, 51 P.3d 874].) He contends the trial court's responses to defendant's objections during summation and rebuttal suggested any objection or request for an admonition would have been futile. Citing our decision in *Hill, supra,* 17 Cal.4th at pages 820–821, defendant also argues he should be excused from the legal obligation to object to prosecutorial misconduct because the prosecutor's summation was "so poisonous" that repeated objections by counsel would have risked angering the court or the jurors.

Defendant, however, fails to show that any of these exceptions applies to any of his failures to object. We therefore conclude that defendant has forfeited each claim of misconduct.

In any event, we find each claim is without merit. As to each instance alleged, either the prosecutor did not commit misconduct or any misconduct was harmless even absent an admonition.

### (1) *Alleged Attacks on Defense Counsel*

Defendant claims numerous instances of prosecutorial misconduct in which the prosecutor denigrated the honesty and integrity of defense counsel. We address each claim seriatim.

### (a) *Defense Counsel's References to Punishment and Partisans*

At the guilt phase, the prosecutor began his closing argument in rebuttal with these comments: "I will let you know what it was that I wanted to talk

to you so badly about yesterday. [¶] Both Mr. Meloling and Mr. Selvin [defense attorneys] have tried to give you the impression that Mr. Jackson is not being punished and that we are seeking the ultimate in penalty. And I believe both of them have used somewhat that issue. [¶] But that is not what we are here for. That type of argument is improper in my mind. . . . [¶] And it is improper for them to try to persuade you that the punishment is appropriate for you to consider in this phase of this trial. [¶] Both of them have done that and both of them have argued to you, especially Mr. Meloling with respect to Mr. Jackson. He said the People treat Mr. Jackson like a saint. . . . [¶] So when both of these gentlemen get up here and try to sway your feeling about how you should approach your task, it is improper in my mind. And when they ask you to be partisans to this trial rather than being the impartial judges as you have been sworn to be, as Mr. Selvin suggested that you do yesterday, that is improper."

Defendant contends that, with these comments, the prosecutor impugned defense counsel's integrity by (1) accusing counsel of improperly arguing that the jury should consider punishment during its deliberations in the guilt phase, and (2) accusing counsel of improperly urging jurors to "be partisans."

Prosecutorial argument that denigrates defense counsel directs the jury's attention away from the evidence and is therefore improper. (*Frye, supra*, 18 Cal.4th at p. 978.) In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks. (*Ibid.*, citing *U.S. v. Lopez-Alvarez* (9th Cir. 1992) 970 F.2d 583, 597.)

Here, there is no reasonable likelihood the jury construed the prosecutor's argument as an attack on counsel's integrity. That the jury, in arriving at a verdict, is not to consider the subject of punishment is well established. (*People v. Nichols* (1997) 54 Cal.App.4th 21, 24 [62 Cal.Rptr.2d 433].) At the conclusion of his argument, Selvin stated, "And you know what is at stake." Although counsel may have intended this statement to be a legitimate reminder of the importance of deliberations, the prosecutor reasonably could have interpreted it in the manner suggested by his argument and thus properly reminded the jury of its duties.

As for the prosecutor's remark that Meloling, in particular, improperly argued that the jury should consider punishment in regard to prosecution witness Jackson, there is no reasonable likelihood the jury would construe this remark as denigrating defense counsel. Meloling had argued that Jackson had lied about his experience with guns in spite of being granted immunity, and had been treated like a "saint" by the prosecution. The jury likely understood the prosecutor's rebuttal that counsel's argument "isn't true" to be

proper commentary on the state of the evidence rather than a personal attack on counsel. Although the prosecutor misattributed to Meloling the improper suggestion that the jury consider punishment in its deliberations, the mistake was fleeting and therefore harmless. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [113 Cal.Rptr.2d 27, 33 P.3d 450] (*Kipp*) [prosecutor's comment was harmless because it was brief, not repeated, and did not contribute to other errors].)

Finally, contrary to defendant's contention, the prosecutor did not engage in misconduct in faulting defense counsel for inappropriately requesting that the jurors be partisans in this case. In his attempt to explain the prosecution's burden of proof, Selvin had improperly asked the jury to "respond" on behalf of the defense to the prosecution's rebuttal summation. But because Selvin had emphasized that jurors were not partisans, but neutral judges of facts, the jury likely viewed the prosecutor's remark as a fair response and not a personal attack on defense counsel. (*Frye, supra,* 18 Cal.4th at p. 978.)

### (b) *Robinson's Knit Cap*

Defendant also cites the prosecutor's comment Selvin had "twisted" the record regarding the limited purpose for which the court admitted the knit cap belonging to Robinson, who was in the southwest bedroom when defendant crashed through the living room window and began shooting. Defense counsel had asked Lieutenant Sims on direct examination whether police officers had shown Hackett, who was in the kitchen, a knit cap and asked her to identify it. The trial court overruled the prosecutor's hearsay objection and permitted the defense to elicit from Sims that Hackett identified the cap as the one worn by the perpetrator. Based on this information, Sims believed the cap had significance to the case. The trial court then instructed the jury that Sims's testimony was not offered to prove the truth of what Hackett had said but only to show that upon receiving certain information from Hackett, the police subsequently acted in a certain way.

In closing argument, Selvin discussed Robinson's testimony identifying the cap as her own and Hackett's statement to Lieutenant Sims identifying the cap as the one worn by the perpetrator. He implied this inconsistency, combined with the fact that police officers had taken the cap to Hackett to identify, raised a "question of suggestibility." He then told the jury that although Hackett identified the cap as the one worn by the shooter, "we know, in fact, he was not wearing it."

At this point, the prosecutor objected to counsel's argument on the ground that Hackett's statement was admitted not for its truth but to show its effect on Lieutenant Sims. The trial court overruled the objection, finding the

defense argument a fair comment on the evidence. Thereafter, Selvin added, "Regardless of why the court let it in, I think that it is a suggestibility, how things are suggested and not done necessarily for bad motives. It is just part of a process that occurs. [¶] See, . . . [w]itnesses make mistakes. That is my point."

In rebuttal, the prosecutor accused Selvin of taking the cap evidence out of context when he implied that Hackett's statement to Sims was "suggested" to her by the police. The prosecutor reminded the jury of the trial court's admonition limiting consideration of Hackett's statement. The prosecutor then asked the jury, "Now, what is going on? . . . The evidence is taken out of context by defense counsel."

■■■ We find no misconduct. "To observe that an experienced defense counsel will attempt to 'twist' and 'poke' at the prosecution's case does not amount to a personal attack on counsel's integrity." (*People v. Medina* (1995) 11 Cal.4th 694, 759 [47 Cal.Rptr.2d 165, 906 P.2d 2] (*Medina*).) Here, each side was simply urging the jury to draw different inferences from the evidence. As such, the prosecutor's comments were a fair response to defense counsel's remarks.

(c) *Terrence Young's Testimony*

Terrence Young, defendant's brother, was released from juvenile hall around the end of February 1989. He testified that was when he purchased the jacket the police seized on March 1 from the bedroom he shared with defendant. According to Fite, the jacket was similar to the one defendant wore when he shot Frazier. During closing argument, Meloling argued the prosecutor had not presented evidence to rebut Terrence's testimony that he purchased the jacket after the Frazier murder occurred. In rebuttal, the prosecutor showed the jury Terrence's jacket and argued the condition of the jacket showed it was obviously more than a couple of days old when the police seized it on March 1. The prosecutor asked, "What is the most crucial piece of evidence that the defense presented? It was Terrence Young. And it was a lie, an unadulterated lie. [¶] . . . [¶] And you know yourselves that jacket is not new. And that is the only evidence that the defense presented on that issue. And it was a lie."

■■■ Defendant contends that the prosecutor again denigrated defense counsel's integrity by calling Terrence a liar and insinuating counsel knew Terrence had lied to the jury. We disagree. "[T]he prosecutor is entitled to comment on the credibility of witnesses based on the evidence adduced at trial." (*People v. Thomas* (1992) 2 Cal.4th 489, 529 [7 Cal.Rptr.2d 199, 828 P.2d 101].) The general thrust of the prosecutor's argument was that the

condition of the jacket proved Terrence was not credible, not that defense counsel knew Terrence had lied. "[W]e do not lightly infer that he intended [his remarks] to have their most damaging meaning, or that the jury would draw that meaning from the other, less damaging interpretations available." (*Id.* at p. 530; *Donnelly v. DeChristoforo, supra,* 416 U.S. at p. 647.)

### (d) Defense Counsel's Erroneous Summary of the Law

During closing argument, Selvin incorrectly explained that the "entry" element of burglary was also included in the definition of robbery murder. In response, the prosecutor argued, "Now this is one of those things I wanted to talk to you about yesterday afternoon. [¶] . . . Selvin gets up . . . and he says, well, [the prosecutor and Meloling] didn't discuss the law of homicide [i.e., robbery murder] so it looks like I have the burden of doing it. And then he told you what was the most nonsensical, unintelligible gibberish about the law of homicide as it applies to this case as I have ever heard in my life. . . . [¶] And whatever garbage [Selvin] was talking about yesterday, I could see your eyes and you were just kind of looking like what is this."

 Defendant claims this argument abusively denigrated defense counsel and improperly injected the prosecutor's own experience into the proceedings. We conclude no misconduct occurred. A prosecutor is entitled to argue his or her case vigorously and may properly assert that defense counsel's argument reflected a misunderstanding of the relevant law. (*People v. Jones* (1997) 15 Cal.4th 119, 175 [61 Cal.Rptr.2d 386, 931 P.2d 960] (plur. opn. of George, C. J.), overruled on another point by *Hill, supra,* 17 Cal.4th at p. 823, fn. 1.)

A review of the entire argument persuades us the prosecutor was merely determined to correct Selvin's mistake and inform the jury that the crime of robbery murder did not include an "entry" element. There is no reasonable likelihood that the jury would interpret this remark as a personal attack on the integrity of counsel.

### (e) Sergeant Sitterud's Search Warrant Affidavit

During closing argument, Selvin questioned the accuracy of Thomas's testimony that he saw defendant holding a gun as he crashed through the living room window of the 74th Avenue house, noting that he did not mention he saw a gun in his initial interview with Sergeant Sitterud. Selvin then implied that the statement in Sitterud's search warrant affidavit that Thomas described seeing a .38-caliber revolver in defendant's hand did not come from Thomas, and that Sitterud had obtained the gun information from the

ballistics expert. Selvin further suggested that Thomas's testimony was not based on personal observation but on facts he learned through what counsel called the "power of suggestion" resulting from police interviews and trial preparation.

Defendant contends the prosecutor engaged in misconduct when he repeatedly referred to defense counsel as "liars" for arguing the gun information Sitterud included in his search warrant affidavit came from the ballistics expert and not Thomas, characterizing counsel's argument as "idiocy," and suggesting counsel may have been practicing "the power of deception" throughout trial. Defendant contends the prosecutor further impugned the honesty and integrity of defense counsel when he argued: "Selvin yesterday argued that they did not mention a gun. I remind you, can you shoot yourself with a banana? [¶] I mean, what kind of idiots does he think you people are? He knows better than that. By God, we have heard at least a dozen times he has been practicing law for over 20 years."

We agree that to the extent the prosecutor characterized defense counsel as "liars" or accused counsel of lying to the jury, the prosecutor's remarks constituted misconduct. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302 [18 Cal.Rptr.2d 796, 850 P.2d 1].) The remarks, however, were harmless. The prosecutor's remarks were made in response to counsel's erroneous argument implying Sergeant Sitterud had received the gun information contained in the search warrant affidavit from the ballistics expert and not Thomas. It is reasonably likely that the jurors viewed the prosecutor's remarks as mere reciprocal retort in an effort to rehabilitate the integrity of the maligned law enforcement officer and gave it little to no consideration. Further, the trial court instructed the jury that it was to decide the case based on the evidence admitted at trial and that the arguments of counsel were not evidence. Under these circumstances, the prosecutor's brief remarks resulted in no miscarriage of justice within the meaning of the California Constitution. (*People v. Stewart* (2004) 33 Cal.4th 425, 499 [15 Cal.Rptr.3d 656, 93 P.3d 271].)

We deem the prosecutor's characterization of Selvin's argument as "idiocy" as fair comment on counsel's argument. The prosecutor made the remark in the context of reminding the jury that Thomas's statement to Sitterud about how the intruder shot him (Thomas) in the forearm logically implied the intruder used a gun. It is not reasonably likely the jurors would have understood it to reflect negatively on counsel's integrity. Similarly, it is not reasonably likely the jurors would have understood the prosecutor's query, "what kind of idiots does he think you people are?," as seriously suggesting Selvin thought they were "idiots" or "disrespected" them.

### (f) *Remarks Regarding Surviving Victims*

Defendant argues the prosecutor continued to impugn the motives of defense counsel by arguing that they (1) had no "right as human beings" to imply the victims were less important because they used drugs; (2) had "the unmitigated gall . . . to suggest that Melva Fite is an unadulterated liar"; and (3) tried "to dirty" certain prosecution witnesses by suggesting their drug use necessarily made them less credible.

Our review of the record reveals no argument by counsel that the victims' lives were less important because of their drug use. Counsel had properly argued that the jury should consider the prior drug use and felony convictions of some of the witnesses in evaluating the accuracy of their observations and recollections. Thus, the prosecutor misled the jury and committed misconduct to the extent he argued counsel stated the lives of certain witnesses were unimportant and implied the witnesses' prior drug use and felony convictions were not relevant to their credibility. We conclude, however, defendant was not prejudiced by the remarks. The trial court instructed the jurors as to the factors they could consider in determining the believability of a witness, including prior felony convictions.

We additionally conclude the prosecutor's remark regarding Fite's credibility did not constitute misconduct. Counsel had challenged Fite's testimony by arguing she was involved in a drug transaction shortly before Frazier was murdered. Read in the context of the prosecutor's broader argument that there was no such evidence of Fite's drug involvement, the remark that counsel had the "unmitigated gall" to suggest Fite was a liar was a fair response to counsel's attack on her credibility.

### (g) *Remarks Regarding Victim Gerald Livingston*

Defendant claims the prosecutor ridiculed Selvin by referring to him pejoratively as a "man of all seasons" during the prosecutor's discussion of the Livingston robbery: "And after [defendant] robs Livingston, and this is where . . . Selvin says, well, I am so good because I can make Livingston change his testimony when he said he put it on the dresser and then he was—handed it to him or whereas he was putting it down, he grabbed it out of his hand. [¶] A man of all seasons. He will testify to anything. Who cares? [¶] Livingston said the guy took $40. Who cares whether it was sitting on there, was in his hand. Did he take it by force? Did he take it at gunpoint? Livingston said he had a long, dark revolver."

Whether the prosecutor was characterizing Selvin or Livingston as a "man of all seasons" is unclear. In any event, the remark was brief and vague in

that it was entwined within a multilayered and somewhat confusing argument. It is not reasonably likely the jurors would have understood this remark to reflect a personal attack on counsel's integrity.

### (2) *The Prosecutor's Description of Defendant*

Defendant contends that the prosecutor engaged in misconduct on two occasions during rebuttal by improperly appealing to the passions and prejudices of the jurors in arguing: "This is not just a simple killing. This is a *serial* killing. This man is out to murder people in our community. And it is evidenced by three killings and two almosts." (Italics added.) The prosecutor later remarked: "[Counsel] would have you think that there were people on this corner and that corner and people shooting a gun and everything. No. No. It was only the defendant. Only the defendant doing on February 19th what he did on [the] 30th of January in two different locations; *terrorizing and killing people*. That is all it was. Don't know why." (Italics added.)

■ "A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251 [278 Cal.Rptr. 640, 805 P.2d 899].) We do not think the prosecutor's statements exceeded the bounds of proper argument. The statements at issue constituted reasonable comment on the evidence. A fair review of the record supports the description of defendant as someone who posed a threat to the entire community. The prosecutor, moreover, had reminded the jurors that the verdict could not be influenced by their passions and prejudices, and the trial court subsequently so instructed them.

Defendant contends that the prosecutor attempted to shift the burden of proof to the defense when, at the conclusion of his remarks regarding the Davis murder, he summarized as follows:

"What fact—what fact other than conjecture and insinuation do you have to say there is a reasonable interpretation of that evidence that leads to the defendant's innocence? What? None. You don't have any. There is none.

"Think of what set of circumstances that are reasonable that will hold water, that will hold together, that would say to you as a jury the defendant did not kill Sylvester Davis. There is no evidence. The only evidence you have is that the defendant went into that place alone and left alone."

■ We conclude no misconduct occurred. Although a prosecutor may comment that a defendant has not produced any evidence, he or she may not

suggest that "a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Here, the prosecutor did not cross the critical line, as there is no reasonable likelihood the jurors would have understood the prosecutor's argument as imposing any burden on defendant.

Nor is there a reasonable likelihood the jurors would have understood the comments as an indirect reference on defendant's failure to testify, in violation of *Griffin v. California, supra,* 380 U.S. at pages 613–615. The prosecutor's comments here "did not allude to the lack of refutation . . . but rather to the lack of *evidence*, which might have been presented in the form of physical evidence or testimony other than that of defendant." (*People v. Bradford, supra,* 15 Cal.4th at p. 1340.) The comments cannot fairly be interpreted as referring to defendant's failure to testify.

### (3) *Alleged References to Matters Not in Evidence*

Defendant contends the prosecutor engaged in misconduct when he made several references to matters not in evidence. First, he asserts that during closing argument and rebuttal, the prosecutor improperly referred to, and attempted to read from, the search warrant affidavit executed by Sergeant Sitterud that the trial court had ruled inadmissible. In closing argument, the prosecutor mentioned that Sitterud had obtained a search warrant to search defendant's home and that Sitterud had filed an affidavit to obtain the search warrant. The trial court overruled a defense objection and deemed the reference fair argument. In rebuttal, the prosecutor attempted to read from the affidavit that Sitterud "talked to Luther Thomas" and that "Thomas described the gun as a large, dark revolver, .38." The trial court sustained the defense objection to these references on the basis that the affidavit was not in evidence and instructed the jury that the prosecutor was permitted to argue only as to what a witness testified but not as to the contents of the affidavit. We conclude that the prosecutor's transgression, if any, was minor and neither deceptive nor reprehensible. (See, e.g., *People v. Osband* (1996) 13 Cal.4th 622, 698 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Any prejudice was cured by the court's prompt admonition. (See, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1146–1147 [124 Cal.Rptr.2d 373, 52 P.3d 572].)

Next, defendant cites the prosecutor for arguing as follows: "And [Frazier and Fite] were walking up 89th, and this car . . . drives up. . . . And the guy walks up, turns around and says: What did you say? And Ricky says: Wasn't talking to you. And the guy starts shooting. [¶] Now how many shots are in a gun, handgun, .38 caliber? Six. [¶] And you know four were fired at [Miller's house]. . . . [¶] And he starts shooting and he fires two or three shots. If he

fires three he would have had to reload." Defendant contends this argument was sheer speculation because the gun was never recovered and the prosecution's ballistics expert did not testify regarding the number of bullets in the gun. He claims prejudice because the argument allowed the prosecutor to assert the Frazier killing was premeditated.

We find no misconduct. Counsel may argue facts not in evidence that are common knowledge or drawn from common experiences. (*People v. Boyette, supra*, 29 Cal.4th at p. 463.) Here, the prosecutor's argument that the handgun held only six shots was based on common experience that some .38-caliber handguns hold just six shots. While such an argument is indeed speculative, it was also harmless. There is no reasonable likelihood the jurors misconstrued the prosecutor's remarks as suggesting they should consider facts not before them.

Defendant complains further that the prosecutor erroneously argued he (defendant) told Fite, "Bitch, you get out of here or I'll *kill* you too," and thereby improperly implied he intended to kill Frazier. (Italics added.) Fite actually had testified that defendant told her to run or he would "*shoot* [her] too." (Italics added.)

No misconduct appears. Although the prosecutor inaccurately quoted Fite's testimony, the jury reasonably could infer defendant's intent to kill Frazier from the totality of the evidence. When defendant warned Fite to run, he was pointing a gun at Fite and Frazier. Frazier was crouched down with his hands over his face, begging for his life. Seconds later, defendant shot and killed Frazier. Thus, there is no reasonable likelihood that the prosecutor's misstatement misled the jury.

Finally, defendant faults the prosecutor for telling the jury, without a factual basis, that Fite and Livingston did not know each other and met for the first time at the live lineup. The record shows only that Miller attended the same live lineup as Livingston. Nonetheless, the mistake was harmless. "The jury in this case was given the usual advisements that statements by counsel are not evidence, and that it had the duty to determine which facts were proven by the evidence." (*People v. Younger* (2000) 84 Cal.App.4th 1360, 1384 [101 Cal.Rptr.2d 624].)

### (4) *Alleged Vouching*

Defendant contends the prosecutor engaged in misconduct by vouching for the credibility of the ballistics expert: "It is as plain as the nose on your face. There [are] not millions of guns. There is one gun. We don't know where it is, but there is one gun, and the defendant used it on all of his victims . . . ."

[¶] . . . [¶] Now, Chester Young has never seen the defendant except here in the courtroom. He has no idea who is doing the shooting. He is just looking at bullets. *He is pure as driven snow looking at bullets.*" (Italics added.)

 "Prosecutorial assurances, based on the record, regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper 'vouching,' which usually involves an attempt to bolster a witness by reference to facts outside the record." (*Medina, supra,* 11 Cal.4th at p. 757, italics omitted.) Here, the challenged comment merely alluded to the expert's objectivity in analyzing the ballistics evidence in this case, and did not constitute improper vouching.

Defendant further argues the prosecutor "back-handedly" vouched for the credibility of Melva Fite by twice criticizing defense counsel's "unmitigated gall" in doubting her veracity. The record shows that counsel called Fite's credibility into doubt by suggesting she was engaged in drug activities with Frazier shortly before he was shot. In criticizing this attack on Fite's credibility, the prosecutor stated, "There is no evidence. None that [Fite] was out there for some illicit purpose. It is insinuation and conjecture on the part of [counsel]." The prosecutor's criticism, thus, was based on the evidence, or lack thereof, and was entirely proper. (*Medina, supra,* 11 Cal.4th at p. 757.)

### (5) *Cumulative Impact*

Defendant contends the cumulative impact of the prosecutor's misconduct violated his rights to due process, a fair jury trial, and a reliable, nonarbitrary penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and compels reversal. Assuming these claims were properly preserved for review (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), they nonetheless fail on the merits because he has not shown any prejudicial misconduct.

### 5. *Asserted Trial Court Error in Admitting Rebuttal Testimony*

Prosecution witness Melva Fite testified on direct examination that defendant, holding a gun, had exited the driver's side of the vehicle before he approached Fite and Frazier on 90th Avenue and shot Frazier. On cross-examination, Fite acknowledged she had provided oral and written statements to police that the passenger exited the vehicle and did the shooting on 89th Avenue and 90th Avenue and that the driver never exited the vehicle.

During the defense case, Officers Derrick Norfleet and Brian Thiem both confirmed that Fite had stated the shooter exited the passenger side of the vehicle on 89th Avenue and 90th Avenue. In rebuttal, the prosecution sought

to call Dolores White to rehabilitate Fite's credibility by testifying that she (White) observed the man who shot Frazier on 90th Avenue exit the driver's side of the vehicle and that another man was in the passenger seat. Defendant objected to the rebuttal as improper because the defense impeached Fite's credibility on cross-examination and because White had been available to the prosecution during its case-in-chief. The prosecutor replied the proffered testimony was proper to rebut evidence presented by the defense in its own case-in-chief that corroborated its impeachment of Fite.

Pursuant to *People v. Carter* (1957) 48 Cal.2d 737, 753–754 [312 P.2d 665], the court ruled White's testimony admissible and more probative than prejudicial. On appeal, defendant contends that the trial court erred. We disagree.

The decision to admit rebuttal evidence rests largely within the discretion of the trial court and will not be disturbed on appeal in the absence of demonstrated abuse of that discretion. (§ 1093, subd. (d); *People v. DeSantis* (1992) 2 Cal.4th 1198, 1232 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) In *People v. Carter, supra*, 48 Cal.2d at pages 753–754, we stated "proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt." Restrictions are imposed on rebuttal evidence (1) to ensure the presentation of evidence is orderly and avoids confusion of the jury; (2) to prevent the prosecution from unduly emphasizing the importance of certain evidence by introducing it at the end of the trial; and (3) to avoid "unfair surprise" to the defendant from confrontation with crucial evidence late in the trial. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1211 [249 Cal.Rptr. 71, 756 P.2d 795]; *Carter*, at pp. 753–754.)

Here, White's testimony corroborated the portion of Fite's testimony that had been impeached by defense witnesses Norfleet and Thiem. The substance of White's testimony, therefore, had already been conveyed to the jury during the prosecution's case-in-chief. Testimony that repeats or fortifies a part of the prosecution's case that has been impeached by defense evidence may properly be admitted in rebuttal. (See, e.g., *People v. Carrera* (1989) 49 Cal.3d 291, 322 [261 Cal.Rptr. 348, 777 P.2d 121]; *People v. Graham* (1978) 83 Cal.App.3d 736, 741 [149 Cal.Rptr. 6], disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928].) Further, as the trial court determined, the introduction of White's testimony in rebuttal did not implicate the concerns addressed in *Carter*. On this record, we find no abuse of discretion in permitting the rebuttal testimony.

Defendant additionally contends the trial court's error in admitting the rebuttal testimony violated his Fifth, Sixth, and Fourteenth Amendment rights under the federal Constitution to due process of law and a fair trial and also violated section 1093 (order of trial proceedings), thereby impairing his Fourteenth Amendment liberty interest under *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227]. Assuming these claims were properly preserved for review (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), they are without merit because we have concluded that the trial court did not err in admitting the rebuttal testimony. For the same reason, his contention that the prosecutor engaged in misconduct by reserving White's testimony for rebuttal is also meritless.

### 6. *Instructional Issues*

#### a) *Aiding and Abetting Instructions*

Defendant requested that the jury be instructed on an aider and abettor theory of liability, as relevant to the Davis murder, on the basis that there was substantial evidence on which the jury could find he was not the actual perpetrator, but merely an aider and abettor.[12] The trial court denied defendant's request. Defendant claims this was error.

 Even absent a request, the trial court must instruct on the general principles of law applicable to the case. (*Koontz, supra,* 27 Cal.4th at p. 1085.) The general principles of law governing a case are those that are commonly connected with the facts adduced at trial and that are necessary for the jury's understanding of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) The trial court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. (*Ibid.*) Evidence is "substantial" only if a reasonable jury could find it persuasive. (*People v. Hagen* (1998) 19 Cal.4th 652, 672 [80 Cal.Rptr.2d 24, 967 P.2d 563].) The trial court's determination of whether an instruction should be given must be made without reference to the credibility of the evidence. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944 [90 Cal.Rptr.2d 143, 987 P.2d 168].) The trial court need not give instructions based solely on conjecture and speculation. (*People v. Day* (1981) 117 Cal.App.3d 932, 936 [173 Cal.Rptr. 9].)

---

[12] Defendant specifically requested instructions on CALJIC Nos. 3.00 (Principals—Defined), 3.01 (Aiding and Abetting—Defined), and 3.02 (Principals—Liability for Natural and Probable Consequences) as to the Davis murder. In addition, he requested that the trial court give a *People v. Green* (1980) 27 Cal.3d 1, 59–62 [164 Cal.Rptr. 1, 609 P.2d 468] instruction to explain the liability of aiders and abettors for first degree murder. Finally, defendant asked that the then CALJIC No. 8.80, *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], instruction be given to explain the liability of an aider and abettor for felony-murder special circumstances.

Instructions on aiding and abetting are not required where "[t]he defendant was not tried as an aider and abettor, [and] there was no evidence to support such a theory . . . ." (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 404 [226 Cal.Rptr. 880].) In this case, we conclude the trial court did not err in denying defendant's request for instructions on aiding and abetting as to the Davis murder.

According to defendant, the evidence in the record establishes that at least two gunmen were in the house because: (1) Thomas and Livingston provided the police with different descriptions of the assailant; (2) the police found a .32-caliber cartridge in the southwest bedroom and recovered a .38-caliber bullet from the kitchen and another from the hallway; (3) Robinson heard Davis say, "Oh, *they* going to kill me"; (4) as Livingston observed the man in the knit watch cap in front of the house, Robinson was being accosted by the man in the baseball cap down the street; and (5) the presence of the dark four-door car in front of the house suggests that a "getaway driver" was used and that defendant did not act alone. Under defendant's theory, a reasonable jury could have found that he shot Thomas with a .38-caliber gun and a second gunman shot and killed Davis with a .32-caliber gun as defendant accosted Robinson down the street.

Defendant overlooks the fact that both Thomas and Livingston positively identified him at trial as their assailant. These identifications were corroborated by their independent identifications of the jacket taken from defendant on the day of his arrest as "similar" to the one worn by their assailant on February 19, 1989. To find defendant guilty on a theory of aiding and abetting rather than as the actual shooter, the jury would have had to disbelieve either Thomas or Livingston and speculate, based on the descriptions Thomas and Livingston provided to investigators, that defendant and another gunman were in the house. The jury would have had to then speculate that (1) the other gunman shot and killed Davis; (2) defendant shot Thomas and accosted Robinson; and (3) in doing so, defendant acted with the intent of aiding and abetting the second gunman in killing Davis. Such speculation does not mandate instruction on an aiding and abetting theory. (*People v. Perry* (1972) 7 Cal.3d 756, 785 [103 Cal.Rptr. 161, 499 P.2d 129], overruled on another ground in *People v. Green, supra,* 27 Cal.3d at pp. 27–34; see also *People v. Day, supra,* 117 Cal.App.3d at p. 936.) Accordingly, the trial court did not err in denying defendant's request for aiding and abetting instructions as to the Davis murder.

Defendant further contends that the trial court's erroneous denial of his request for instructions on an aiding and abetting theory as to the Davis murder deprived him of an impartial jury, a reliable penalty determination, and due process under the Sixth, Eighth, and Fourteenth Amendments to the

federal Constitution, respectively. Assuming these claims were properly preserved for review (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), his point is without merit because we conclude that the trial court did not err in declining the requested instructions.

### b) *Second Degree Murder Instructions*

Prior to instructing on aiding and abetting, the trial court stated: "The following four instructions should be considered by you only as they apply to counts four [attempted robbery of Fite] and five [Frazier murder]," followed by the relevant instructions.[13] Immediately thereafter, the court instructed as to second degree murder pursuant to CALJIC No. 8.30.

Defendant contends that based on the above instructions, the trial court misinformed the jury that it could consider the instruction defining second degree murder only with regard to the Frazier murder, because the jury would have erroneously believed CALJIC No. 8.30 was one of the "following four instructions" to be considered only as it applied to count 4 (attempted robbery of Fite) and count 5 (Frazier murder). We reject the contention.

 "If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." (*People v. Smithey* (1999) 20 Cal.4th 936, 963 [86 Cal. Rptr. 2d 243, 978 P.2d 1171]; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4 [116 L.Ed.2d 385, 112 S.Ct. 475].) " ' " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " ' " (*Smithey,* at p. 963, quoting *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [74 Cal.Rptr.2d 212, 954 P.2d 475].) The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury. (See *People v. Garceau* (1993) 6 Cal.4th 140, 189 [24 Cal.Rptr.2d 664, 862 P.2d 664] [any possibility of confusion about conspiracy instruction was diminished by the parties' closing arguments], disapproved on another ground in *People v. Yeoman, supra,* 31 Cal.4th at pp. 117–118; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191 [9 Cal.Rptr.2d 834, 832 P.2d 146] [correct view of the law regarding mitigating factors in penalty phase trial was reinforced by the parties' closing arguments].)

 As a preliminary matter, a defendant's failure to request a clarification instruction forfeits that claim on appeal. (*People v. Marks* (2003) 31

---

[13] Specifically, the trial court read the following four instructions: (1) CALJIC No. 3.00 (Principals—Defined); (2) CALJIC No. 3.01 (Aiding and Abetting—Defined); (3) CALJIC No. 3.02 (Principals—Liability for Natural and Probable Consequences); and (4) CALJIC No. 8.27 (First Degree Felony Murder—Aider and Abettor).

Cal.4th 197, 237 [2 Cal.Rptr.3d 252, 72 P.3d 1222].) Here, however, portions of the record regarding the parties' discussion of the jury instructions before the trial court are missing. Thus, because it cannot be ascertained whether defense counsel specifically requested clarification, we shall give defendant the benefit of the doubt and find the issue preserved for appeal. Nonetheless, defendant's claim is without merit.

The record contains no inquiries from the jury regarding the application of these instructions. We agree with respondent that if the instructions were susceptible of the interpretation defendant now asserts, counsel likely would have objected at trial on this basis. Such an omission suggests that " 'the potential for [confusion] argued now was not apparent to one on the spot.' " (*People v. Keenan* (1988) 46 Cal.3d 478, 535 [250 Cal.Rptr. 550, 758 P.2d 1081] [failure to object to trial court's remarks about potential jury investigation suggested the potential for coercion was not discernible], quoting *Lowenfield v. Phelps* (1988) 484 U.S. 231, 240 [98 L.Ed.2d 568, 108 S.Ct. 546].) Counsel's arguments, moreover, informed the jury that it could consider second degree murder as to the Rivers, Frazier, and Davis murders. Therefore, we find no basis to conclude the jury misinterpreted the above instructions or was confused in any manner as to the applicability of the second degree murder instruction to all of the charged murders. Accordingly, we conclude the trial court did not erroneously limit the second degree murder instructions to the Frazier murder charge.

Defendant additionally contends that the trial court's error in this regard violated his rights to an impartial jury under the Sixth Amendment, to a reliable penalty determination under the Eighth Amendment, and to due process of law under the Fourteenth Amendment of the United States Constitution. Assuming these claims were properly preserved for review (see *Yeoman, supra,* 31 Cal.4th at pp. 117, 133), they are meritless given we conclude that the trial court did not err.

### c) *CALJIC No. 8.80*

Defendant was found death eligible based in part on the robbery-felony-murder special circumstances the jury found true with respect to the Rivers and Frazier murders. The robbery-felony-murder special circumstance applies when "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit . . . [¶] [r]obbery . . . ." (§ 190.2, subd. (a)(17)(A).) Here, the trial court instructed the jury pursuant to CALJIC No. 8.80 [Pre-June 6, 1990 Special Circumstances—Introductory] that if it found "beyond a reasonable doubt that defendant was the actual killer in the Terry Rivers killing in Count One, [and] the Glen

Frazier killing in Count Five, . . . you need not find that the defendant intended to kill a human being in order to find the special circumstances to be true." Citing *Tison v. Arizona* (1987) 481 U.S 137, 158 [95 L.Ed.2d 127, 107 S.Ct. 1676], and *Enmund v. Florida* (1982) 458 U.S. 782, 787 [73 L.Ed.2d 1140, 102 S.Ct. 3368], defendant asserts that CALJIC No. 8.80 is constitutionally defective under the Eighth and Fourteenth Amendments because it permits a finding of death eligibility in the absence of a jury finding that the defendant either intended to kill the victim or, as a major participant in the underlying felony, exhibited a reckless indifference to human life.

■■■ "The United States Supreme Court has made clear that felony murderers who personally killed may properly be subject to the death penalty in conformance with the Eighth Amendment—after proper consideration of aggravating and mitigating circumstances—even where no intent to kill is shown. (*Cabana v. Bullock* (1986) 474 U.S. 376, 386–387 [88 L.Ed.2d 704, 106 S.Ct. 689]; see *Tison v. Arizona* (1987) 481 U.S. 137, 152 [95 L.Ed.2d 127, 107 S.Ct. 1676].) Subsequently, '[i]n *People v. Anderson* [(1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306]], we held that with respect to the actual killer, the court need not instruct on intent to kill in connection with felony-murder special circumstances. Such an instruction is required only when there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer.' (*People v. Gates* (1987) 43 Cal.3d 1168, 1193 [240 Cal.Rptr. 666, 743 P.2d 301].)" (*People v. Belmontes* (1988) 45 Cal.3d 744, 794 [248 Cal.Rptr. 126, 755 P.2d 310], italics omitted.) Defendant asks that we reconsider our decision in *Anderson*, but he offers no persuasive reason to do so.

■■■ Defendant further asserts that as to the Rivers and Frazier murders, the evidence was insufficient to establish he was the actual killer and intended to kill. "Evidence that the defendant is the actual killer and guilty of felony murder . . . establishes 'a degree of culpability sufficient under the Eighth Amendment to permit defendant's execution.' " (*People v. Smithey, supra,* 20 Cal.4th at p. 1016; see *People v. Hayes* (1990) 52 Cal.3d 577, 632 [276 Cal.Rptr. 874, 802 P.2d 376] (*Hayes*).) Moreover, a jury's guilty verdict satisfies the requirements under *Enmund*, even though the trial court's instructions did not explicitly require it to find the *Enmund* factors, when "the theory on which the case was tried and the evidence received leave no doubt that the jury's verdict rested on a finding that the defendant killed or intended to kill." (*Cabana v. Bullock, supra,* 474 U.S. at p. 391, fn. 6.)

We conclude that the record and theories presented in this case leave no doubt that as to the Rivers and Frazier murders, defendant was the actual killer and intended to kill.

With respect to the Rivers murder, the prosecution proceeded against defendant solely on the theory that he actually shot and killed Rivers before he completed his robbery of Miller. As demonstrated above (see *ante*, at pp. 1175–1192), substantial evidence supports defendant's conviction for the first degree murder of Rivers based on a theory of robbery felony murder.

The jury's true finding on the allegation that defendant personally used a handgun during the commission of the Rivers murder is further evidence that the jury concluded he actually killed Rivers. Defendant argues, however, that because a weapon is *used*, if it is merely displayed in a menacing manner and never fired (see *People v. Wims* (1995) 10 Cal.4th 293, 302 [41 Cal.Rptr.2d 241, 895 P.2d 77]) the gun-use true finding does not necessarily establish that he is the actual killer. Although "[t]he finding of personal use . . . would not in itself prove defendant was the actual killer" (*People v. Jones* (2003) 30 Cal.4th 1084, 1120 [135 Cal.Rptr.2d 370, 70 P.3d 359]), here the evidence shows that only one gun was used to commit the crimes at the Miller residence. The prosecution's ballistics expert testified that the bullets removed from the bodies of Miller and Rivers were fired from the same gun. The defense, moreover, presented no evidence that anyone else who may have been present at the Miller residence displayed in a menacing manner, or otherwise used, a gun. Thus, all evidence points to defendant as the one who actually shot and killed Rivers.

We conclude the jury necessarily found defendant to be the actual killer of Rivers, "thereby establishing a degree of culpability sufficient under the Eighth Amendment to permit defendant's execution." (*Hayes, supra,* 52 Cal.3d at p. 632.)

With respect to the Frazier murder, the prosecution's case against defendant was similarly based upon the theory that defendant actually shot and killed Frazier during a robbery. This theory was supported by evidence that just before the Frazier murder, defendant and his cousin, Patrick Jackson, approached Fite and Frazier as they stood on the sidewalk near the corner of 90th Avenue and Cherry Street in Oakland. Defendant exited the driver's side of the car, approached Fite and Frazier, pointed a dark gun at them, and demanded their money. Fite and Frazier begged for their lives. Moments later, after defendant told Fite to run, Fite heard two shots and then saw Frazier slump to the ground.

Patrick Jackson, defendant's cousin, testified under a grant of immunity that defendant was driving a black-over-green Ford LTD on the night in question and pulled into a driveway near 89th Avenue and Cherry Street. According to Jackson, defendant possessed a dark revolver with a brown handle when he initially got into the car. Jackson heard at least one shot and

saw Fite run down Cherry Street. After defendant returned to the car, he drove Jackson to an apartment on 76th Avenue. Along the way, defendant told Jackson that the man he shot had robbed him earlier. At the apartment, defendant parked his car, and Jackson got his own car. Defendant and Jackson then went to a motel room that Jackson had rented during the afternoon of the 29th and spent the rest of the night watching television and sleeping.

The defense argued it was Jackson who exited the driver's side and shot Frazier and that, at most, defendant was guilty of aiding and abetting. But no evidence indicated that someone other than the actual killer possessed a gun. Thus, in finding defendant guilty of the first degree murder of Frazier and sustaining the allegation that he personally used a gun during commission of the murder, the jury necessarily rejected this defense and found defendant to be the actual killer. We therefore conclude that defendant's culpability was sufficiently established under the Eighth Amendment to permit his execution. (*Hayes, supra,* 52 Cal.3d at p. 632.)

Accordingly, we need not address defendant's contention that, because the jury was also instructed on an aiding and abetting theory as to the Frazier murder, the trial court erred by failing to instruct the jury that it must find defendant was a major participant in the underlying felony (robbery) and acted with reckless indifference to human life before it could find him death eligible pursuant to the robbery-felony-murder special-circumstance (section 190.2, subdivision (a)(17)(A)). Any instructional error was harmless beyond a reasonable doubt. (*People v. Jones, supra,* 30 Cal.4th at p. 1120; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

### 7. *Cumulative Error*

Defendant contends that the cumulative effect of the guilt phase errors asserted requires reversal regardless of the prejudicial impact of any single error. Because we have determined that no prejudicial error or misconduct occurred at the guilt phase, this contention necessarily lacks merit as well.

### C. *Penalty Phase*

### 1. *Unadjudicated Criminal Conduct*

During the penalty phase, the prosecution presented, over defendant's objection, the following evidence that defendant had committed the unadjudicated battery and witness intimidation of Steven Ross (the Ross battery and witness intimidation), in violation of sections 242 and 136.1, respectively.

(§ 190.3, factor (b) [permitting jury consideration of "criminal activity by the defendant which involved the use or attempted use of force or violence"].)

On July 16, 1990, during this trial, the police arrested Steve Ross and took him to Oakland Municipal Court where he met with the prosecutor and chief investigator in this case. After this meeting, officers took Ross to the Alameda County Jail and placed him in a holding cell with approximately 15 other inmates. The holding cell was equipped with a toilet bowl and washbasin. About 30 minutes later, officers placed defendant in the holding cell.

Ross testified that after defendant was placed in the holding cell, defendant walked over to him, smiled, and began to punch him in the face. Ross fell to the floor, got up, and ran to the cell door. As he banged on the cell door for help, defendant said, "You snitched on me and my lawyer had it in black and white and I should have killed you."[14]

Deputy Sheriff James King heard the disturbance and went to the holding cell where he observed defendant, Ross, and several other inmates inside. Ross was bleeding from his mouth and nose. King observed "barely noticeable" blood splattering on defendant's jogging suit. One sleeve of defendant's jacket was apparently wet with water up to the shoulder. The small bloodstains on defendant's pants appeared washed out and lighter in color. King removed defendant from the holding cell and placed him in the custody of another deputy.

Defendant makes several arguments that his federal constitutional rights were violated as a result of the admission of this evidence.

a) *Constitutional Challenges*

Defendant asserts that (1) the admission of evidence of the Ross battery and witness intimidation as a factor in aggravation at the penalty phase violated his right to due process under the Fifth and Fourteenth Amendments; (2) section 190.3, factor (b) is unconstitutional under the Fifth and Fourteenth Amendments to the extent that it allows the same jury that has already convicted a capital defendant to be presented with such evidence; and (3) pursuant to *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], the jury must unanimously find the existence of unadjudicated criminal conduct beyond a reasonable doubt.

We have repeatedly rejected similar contentions and do so again. The jury's consideration of evidence of unadjudicated criminal conduct

---

[14] Although Ross also testified on cross-examination that defendant stated "I *should* kill you," the parties generally understood Ross's testimony as stating defendant told him, "I *should have* killed you."

during the penalty phase does not offend a defendant's right to due process or any rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*People v. Lewis* (2001) 26 Cal.4th 334, 395 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Balderas* (1985) 41 Cal.3d 144, 204–205 [222 Cal.Rptr. 184, 711 P.2d 480].) Specifically, due process does not require that penalty evidence be heard by a separate jury. (*Balderas*, at pp. 204–205.) Jury unanimity is not required on findings of unadjudicated criminal conduct. (*People v. Prieto* (2003) 30 Cal.4th 226, 265 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) "Moreover, *Ring* [*v. Arizona, supra,* 536 U.S. 584] does not require the jury to unanimously make such a finding beyond a reasonable doubt." (*Prieto*, at p. 265; see *id.* at pp. 262–263 [*Ring* does not affect the California death penalty scheme].)

b) *Notice Requirement*

The prosecution's original notice of evidence in aggravation was filed pretrial on May 15, 1990, and referred to section 190.3, factor (b) evidence of "criminal activity by the defendant which involved the use or attempted use of force or violence." No specific incident was described in the notice. On July 23, 1990, three weeks into the jury selection proceedings, the prosecution amended the notice of proposed aggravation evidence to include defendant's alleged battery and witness intimidation of Ross that occurred one week earlier, on July 16, 1990.

Defendant contends that the prosecution failed to give timely notice of its intent to introduce evidence of the Ross battery and witness intimidation as an aggravating factor, and thus violated his rights to procedural due process under the Fourteenth Amendment and to notice under section 190.3. Respondent asserts that the claimed error is not cognizable on appeal as defendant failed to object on this ground. We agree. Defense counsel objected at trial to the admission of the evidence of other criminal conduct on the ground of "fairness," based on the prejudicial effect of such evidence in light of the charged offenses as well as counsel's belief that the prosecution manufactured the evidence to "create[] their own case." Because this objection did not include the ground of inadequate notice, it was insufficient to preserve that issue for appeal. (See *People v. Carrera, supra,* 49 Cal.3d at p. 334 [objection that testimony was cumulative was not sufficient to preserve inadequate notice claim].)

 Nonetheless, any failure to give defendant timely notice of the evidence of the Ross battery and witness intimidation was harmless. Section 190.3 declares in pertinent part that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined

by the court, *prior to trial*." (Italics added.) "We . . . have held that where the prosecution learns of evidence it intends to use in aggravation at the penalty phase for the first time after trial has commenced, exclusion of this evidence under section 190.3 is not necessarily compelled. [Citation.] Under such circumstances, the defendant is entitled to prompt notice of the newly discovered evidence, and, if necessary, to a reasonable continuance to enable him or her to prepare to meet that evidence. If the prosecution's delay in affording notice is unreasonable or unexcused, or if the delay would prejudice the defense, the court must exclude the evidence." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1070 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

Here, the original notice filed by the prosecution prior to trial did not mention the evidence of the Ross battery and witness intimidation, as the incident did not occur until two weeks after the jury selection proceedings had commenced. One week after the alleged battery and witness intimidation occurred, however, *and some three months prior to commencement of the guilt phase*, the defense was notified that the prosecution intended to introduce this evidence in the penalty phase. Disclosure was made promptly under the circumstances, and defendant clearly had adequate time to meaningfully prepare to defend against the evidence. (*People v. Daniels* (1991) 52 Cal.3d 815, 880, fn. 28 [277 Cal.Rptr. 122, 802 P.2d 906] [notice was given months before the penalty trial].) Indeed, counsel's failure to request a continuance suggests that any defect in the notice was not prejudicial. (*Pinholster, supra,* 1 Cal.4th at p. 957.) Thus, the absence of a showing of prejudice precludes relief in any event.

c) *Phillips Hearing*

Defendant contends that the trial court violated his Eighth Amendment right to a reliable determination of penalty and Fourteenth Amendment right to due process when it denied his request for a hearing pursuant to *People v. Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423], to determine the existence of substantial evidence to prove each element of the Ross battery and witness intimidation.

In *Phillips,* a plurality of this court suggested "that in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element of the other criminal activity." (*People v. Phillips, supra,* 41 Cal.3d at p. 72, fn. 25 (plur. opn. of Reynoso, J.).) We did not, however, require such an inquiry. (*Clair, supra,* 2 Cal.4th at p. 677, citing *People v. Jennings* (1991) 53 Cal.3d 334, 389 [279 Cal.Rptr. 780, 807 P.2d 1009].) Nor did we predicate the admission of evidence of unadjudicated criminal conduct on the outcome of such an inquiry. (*Jennings,* at p. 389.) Therefore, the trial court did not err in denying his request to conduct a *Phillips* hearing.

### d) *Sufficiency of Evidence of a Battery and Witness Intimidation*

Defendant asserts that the evidence was insufficient to prove he committed battery and witness intimidation, within the meaning of sections 242 and 136.1, respectively.

The trial court instructed the jury that "[b]efore a juror may consider any such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant, Robert Young, did, in fact, commit such criminal acts."

 Evidence that defendant, unprovoked, approached Ross in the holding cell and punched him in the face, causing him to bleed from his nose and mouth, is plainly sufficient to constitute a battery. (See § 242; *People v. Madison* (1969) 3 Cal.App.3d 984, 986 [84 Cal.Rptr. 71] [evidence that suspect kicked police officer and scratched him about the face and on his right hand was sufficient to sustain simple battery conviction].)

 The crime of intimidating a witness requires proof that the defendant specifically intended to dissuade a witness from testifying. (*People v. Lyons* (1991) 235 Cal.App.3d 1456, 1460–1462 [1 Cal.Rptr.2d 763]; *People v. Ford* (1983) 145 Cal.App.3d 985, 989–990 [193 Cal.Rptr. 684].) Defendant complains that the prosecution did not prove that he had the requisite specific intent. He argues that his statement to Ross in the holding cell that "[y]ou snitched on me and my lawyer had it in black and white and I should have killed you" neither referred to any future testimony by Ross nor constituted a threat to do anything in the future. He adds that even if his statement to Ross were misunderstood as a desire to exact retribution for Ross's past act of assisting the police in this case, it is nonetheless insufficient to establish the specific intent element to support a conviction for intimidating a witness.

We disagree. It is the combination of defendant's actions and words in the holding cell that provides sufficient evidence that he intended to intimidate Ross from testifying at trial. Defendant violently punched Ross about the face and told him, "I should have killed you" because he had learned from his attorney that Ross had "snitched" on him regarding this case. Jurors reasonably could have drawn the inference that the message Ross received from defendant's retribution for Ross's past cooperation with the police was that defendant would again harm him physically if he continued to cooperate in the future (e.g., by testifying at trial). (See *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344–1345 [69 Cal.Rptr.2d 728] [the defendant's words not only expressed dissatisfaction with witness's past testimony but also attempted to dissuade her from giving any further testimony in the future].)

Defendant knew from his attorney that Ross was cooperating with the police, and that he expected Ross to testify at trial can be reasonably inferred. Also, because Ross spoke with defendant on the sidewalk in front of the 74th Avenue house just moments before Davis was murdered, defendant knew Ross could implicate him in the Davis murder. Thus, jurors could have reasonably inferred that defendant's jail cell attack on Ross reflected his specific intent to intimidate Ross from testifying against him in the future.

We conclude the evidence was sufficient to prove that defendant committed the offenses of battery and witness intimidation, and was therefore admissible pursuant to section 190.3. Even if the evidence were somehow insufficient to show witness intimidation, it was admissible to show battery.

e) *Asserted Error in Instruction on Witness Intimidation*

The trial court instructed the jury as follows regarding the offense of witness intimidation, in violation of section 136.1: "Every person who knowingly and maliciously prevents or dissuades, or attempts to so prevent or dissuade any witness from attending or giving testimony at any trial, where such act is accomplished by force or by the express or implied threat of force or violence, is guilty of a violation of section 136.1(c) of the Penal Code."

In order to prove the offense of witness intimidation in violation of section 136.1, subdivision (c), however, the prosecution must establish that the defendant had the specific intent to dissuade a witness from testifying. (*People v. Ford, supra,* 145 Cal.App.3d at pp. 989–990.) Hence, because the jury instruction in this case omitted the specific intent element, defendant contends reversal is required. His contention is meritless.

As a preliminary matter, it is unknown whether defendant objected to the erroneous instruction, because the record does not include the reporter's transcripts of several conferences regarding jury instructions. But "[b]ecause defendant had the right to *correct* instructions on the elements of other crimes introduced in aggravation [when given], and because courts may review instructional errors that affect 'the substantial rights of the defendant' (§ 1259)," the issue is cognizable on appeal. (*People v. Prieto, supra,* 30 Cal.4th at p. 268.)

In any event, defendant is correct that the jury instruction regarding the offense of witness intimidation omitted the requisite language that defendant specifically intended to prevent or dissuade Ross from testifying at trial. (CALJIC No. 7.15.) The question now is whether the erroneous instruction was prejudicial. It appears the error was harmless.

State law error occurring during the penalty phase of a capital case requires reversal of the judgment if there is a reasonable possibility that the

jury would have reached a different result if the error had not occurred. (*People v. Brown* (1988) 46 Cal.3d 432, 447–448 [250 Cal.Rptr. 604, 758 P.2d 1135].) As demonstrated above, evidence of defendant's specific intent to dissuade Ross from testifying at trial was overwhelming. Defendant punched Ross in the face after learning that Ross was cooperating with the police regarding the break-in and murder at the 74th Avenue house. As he punched Ross, defendant told him, "You snitched on me and my lawyer had it in black and white and I should have killed you." Defendant's intent to dissuade Ross from testifying at trial is readily inferred from his actions and words. Accordingly, we perceive no reasonable possibility the jury would have rendered a different verdict had the erroneous instruction not been given.

Defendant further contends that the erroneous instruction deprived him of due process under the Fourteenth Amendment and a reliable penalty determination under the Eighth Amendment of the United States Constitution. Assuming these claims were properly preserved for review (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), they are meritless because we conclude that the trial court did not err.

### 2. *Defendant's Absence During Penalty Phase Testimony*

Defendant claims the trial court violated his state and federal constitutional rights to due process, confrontation, and a reliable determination of his guilt and penalty when it took evidence at the penalty phase in his absence. In addition, defendant contends that the trial court erred under sections 977 and 1043 when it accepted his alleged waiver of the right to be present at the penalty phase. Defendant maintains these errors require reversal of the penalty phase judgment. We disagree.

#### a) *Factual Background*

On October 31, 1990, during the defense case at the penalty phase, defense counsel began his examination of neuropsychologist Dr. Robert Kaufman. During this testimony, the trial court recessed for lunch. Upon returning for the afternoon session, and outside the presence of the jury, defense counsel informed the court that defendant had informed him during the recess that he "would just as soon not hear the testimony of [certain] witnesses," including Dr. Kaufman and two of defendant's former school teachers. The trial court proceeded as follows:

"THE COURT: Mr. Young, you understand you have the right to be present or not be present. That is your choice. And has Mr. Meloling correctly stated your position regarding future attendance here at the proceeding?

"THE DEFENDANT: Yeah."

Upon the jurors' return, the court informed them that defendant had exercised his right not to be present during the presentation of certain testimony, and admonished them that they were not to speculate about defendant's exercising that right or allow it to affect their deliberations on the issue of penalty.

### b) *Constitutional Right to Be Present*

"A defendant has the right, under the Sixth Amendment of the federal Constitution, to be present at trial during the taking of evidence." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1209 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (*Jackson*); *United States v. Gagnon* (1985) 470 U.S. 522, 526 [84 L.Ed.2d 486, 105 S.Ct. 1482].) "Nonetheless, as we have concluded, 'as a matter of both federal and state constitutional law, . . . a capital defendant may validly waive presence at critical stages of the trial.'" (*Jackson*, at p. 1210, quoting *People v. Price* (1991) 1 Cal.4th 324, 405 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Here, the record reflects that defendant was voluntarily absent from the courtroom during Dr. Kaufman's remaining testimony and the entire testimony of two of his elementary schoolteachers. We find nothing improper about the trial court's acceptance of defendant's conduct as voluntary waiver of his presence. (See, e.g., *People v. Weaver* (2001) 26 Cal.4th 876, 965–967 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *Price*, at p. 405.) We reject defendant's claim that his waiver was invalid because of his "borderline level intelligence," a level described by Dr. Kaufman as just above the level that qualifies for mental retardation. Nothing in the record suggests that he was unable to understand and waive his right to be present. Moreover, counsel made no objection to defendant's waiver on this basis and thus did not preserve the issue for appeal. Accordingly, we conclude defendant validly waived his state and federal constitutional rights to be present at the penalty phase.

### c) *Statutory Right to Personal Presence*

Subdivision (b)(1) of section 977 states in pertinent part: "In all cases in which a felony is charged, the accused *shall* be present . . . during those portions of the trial when evidence is taken before the trier of fact . . . . The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present . . . ." (Italics added.) Section 1043, subdivision (b) states: "The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: [¶]

(1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom. [¶¶] (2) Any prosecution for an offense *which is not punishable by death* in which the defendant is voluntarily absent." (Italics added.)

 "[W]hen read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1). However, section 977, subdivision (b)(1), the subdivision that authorizes waiver for felony defendants, expressly provides for situations in which the defendant cannot waive his right to be present, including during the taking of evidence before the trier of fact. Section 1043, subdivision (b)(2), further makes clear that its broad 'voluntary' exception to the requirement that felony defendants be present at trial does not apply to capital defendants." (*Jackson, supra,* 13 Cal.4th at p. 1210; accord, *Frye, supra,* 18 Cal.4th at p. 1010.) Thus, the trial court erred under sections 977 and 1043 by permitting a nondisruptive capital defendant to be absent during the taking of evidence at the penalty phase. (*Jackson,* at p. 1210.)

 Here, the trial court's error in accepting defendant's waiver was harmless. (*People v. Brown, supra,* 46 Cal.3d at pp. 447–448.) Defendant's argument that his absence from the penalty phase was "simply devastating" because the jury likely concluded that he was indifferent to the outcome of the proceeding, had no respect for the jurors, and did not take the proceedings seriously, is unpersuasive. The jury was admonished not to speculate about his absence, infer anything from it, or allow it to affect their deliberations in any manner. "Jurors are presumed to understand and follow the court's instructions." (*People v. Holt* (1997) 15 Cal.4th 619, 662 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Further, defendant's absence from the cross-examination of his own expert Dr. Kaufman, regarding defendant's neuropsychological assessment, and the entire testimony of his former schoolteachers, was not likely to alter the penalty. Therefore, we conclude the trial court's error was not prejudicial.

### 3. Competency to Stand Trial

Defendant claims that Dr. Kaufman's testimony raised a "serious and bona fide doubt" as to defendant's competence to stand trial and that the trial court abused its discretion by failing to order a section 1368 competency hearing.

## a) *Dr. Kaufman's Testimony*

Robert Kaufman, Ph.D., a licensed psychologist, testified as an expert in the area of neuropsychological testing and assessments. Dr. Kaufman met with defendant in the county jail on August 28, 1990, and administered a number of neuropsychological tests over a three-and-a-half-hour period. When Dr. Kaufman initially encountered defendant, he found defendant to be well oriented, not psychotic, and not suffering from a thought disorder.

Dr. Kaufman administered a variety of tests, including the Wechsler Adult Intelligence Scale (WAIS), the Wide Range Achievement Test, the Lateral Dominance Examination, hand dynamometer, the finger-tapping procedure, the Trailmaking test, the Rey Auditory Verbal Learning list, the Rey-Osterreith Complex Design, the Stroop Color-Word Test, the Wisconsin Card Sorting Test, and the Booklet Category Test. He also interviewed defendant regarding his family history, medical history, substance abuse, and other matters.

Dr. Kaufman measured defendant's verbal intelligence quotient (IQ) as 73, falling in the fifth percentile or the "borderline" range. Defendant's performance IQ, as measured by visual and spatial tasks, was 81, falling in the 12th percentile or the "low average" range. Defendant's overall full-scale IQ was 75, falling in the fifth percentile or the "borderline" range, which, according to Dr. Kaufman, is "just above what qualifies for mental retardation."

Defendant's "level of acquired knowledge" as measured by the WAIS was "exceptionally poor." For example, defendant did not know how many weeks are in a year and could not name four recent Presidents. Defendant also performed "very poorly" on a subtest that assesses a person's ability to solve socially oriented problems. With respect to tests of academic achievement, defendant performed below the fourth-grade level. Dr. Kaufman described defendant as having the educational skills of a nine year old.[15]

On two tests used to assess brain impairment and cognitive dysfunction, defendant performed "extremely poorly" and fell within the "highly impaired range." Defendant also performed poorly on the Rey-Osterreith visual memory test and the booklet category test, "one of the most sensitive tests to brain impairment that is given." Defendant performed "okay" on the Rey Auditory Verbal Learning test, which measures "how somebody can absorb, take in pretty simple, common, everyday information that is presented a number of times." Defendant performed within normal limits on all of the motor functioning tests.

---

[15] The trial court declared a recess at this point in Dr. Kaufman's testimony. Defendant argues that by the recess, there was substantial evidence that raised a "bona fide" doubt as to whether he was mentally competent to stand trial.

Based on defendant's performance on all of the tests administered, Dr. Kaufman diagnosed defendant's mental status as "probable organic mental disorder not otherwise specified." Defendant had a "borderline level intelligence" and "clear deficits" in his "executive functioning"—that is, his ability to accurately perceive social situations and develop strategies to solve problems. Defendant was otherwise generally logical and his behavior generally appropriate.

### b) *Defendant's Competence to Stand Trial*

■■■ "Of course, trial of an incompetent defendant violates an accused's right to due process." (*People v. Weaver, supra,* 26 Cal.4th at p. 903; accord, *Medina v. California* (1992) 505 U.S. 437, 448 [120 L.Ed.2d 353, 112 S.Ct. 2572].) The United States Supreme Court has defined competence to stand trial as a defendant's " ' " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " and " 'a rational as well as factual understanding of the proceedings against him.' " ' " (*Dusky v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 80 S.Ct. 788].) Under California law, a person is incompetent to stand trial "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) A defendant is presumed to be mentally competent to stand trial. (§ 1369, subd. (f).)

■■■ As relevant to this case, section 1368 provides that if the trial court has any doubt as to the defendant's competence to stand trial, it must state that doubt in the record and inquire of counsel whether, in his or her opinion, the defendant is mentally competent. (§ 1368, subd. (a).) The trial court is authorized to conduct a competency hearing on its own motion and at the request of counsel. (§ 1368, subd. (b).)

■■■ "In *People v. Stankewitz* (1982) 32 Cal.3d 80, 91–92 [184 Cal.Rptr. 611, 648 P.2d 578], we observed that even though section 1368 is phrased in terms of whether a doubt arises in the mind of the trial judge and is then confirmed by defense counsel, as this court recognized in *People v. Pennington* (1967) 66 Cal.2d 508, 516–517 [58 Cal.Rptr. 374, 426 P.2d 942], once the accused has come forward with substantial evidence of incompetence to stand trial, due process requires that a full competence hearing be held as a matter of right. [Citation.] In that event, the trial judge has no discretion to exercise. [Citation.] As we also have noted, substantial evidence of incompetence is sufficient to require a full competence hearing even if the evidence is in conflict. [Citation.] We have concluded that where the substantial

evidence test is satisfied and a full competence hearing is required but the trial court fails to hold one, the judgment must be reversed. [Citation.][16]

 " 'Substantial evidence' has been defined as evidence that raises a reasonable doubt concerning the defendant's competence to stand trial. [Citations.] In *People v. Pennington, supra,* 66 Cal.2d at page 519, we enunciated the following standards regarding what would constitute substantial evidence of incompetence to stand trial: 'If a psychiatrist or qualified psychologist [citation], who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied.' " (*Welch, supra,* 20 Cal.4th at pp. 737–738, italics omitted.) In resolving the question of whether, as a matter of law, the evidence raised a reasonable doubt as to defendant's mental competence, we may consider all the relevant facts in the record. (*People v. Danielson* (1992) 3 Cal.4th 691, 727 [13 Cal.Rptr.2d 1, 838 P.2d 729], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069 [108 Cal.Rptr.2d 409, 25 P.3d 618]; *Howard, supra,* 1 Cal.4th at p. 1164.)

Here, based on Dr. Kaufman's testimony, defendant argues that substantial evidence existed that he suffers from a mental disorder, is mentally retarded, or is developmentally disabled.[17] As a result, he maintains Dr. Kaufman's testimony should have alerted the trial court that he lacked the ability to understand the trial proceedings or assist defense counsel.

 To the contrary, while Dr. Kaufman testified defendant had an IQ of 75 and diagnosed defendant's mental status as "probable organic mental disorder not otherwise specified," he did not relate his findings in terms of defendant's competency to stand trial. He made no diagnosis that defendant

---

[16] But see *People v. Ary* (2004) 118 Cal.App.4th 1016, 1025–1029 [13 Cal.Rptr.3d 482] (in some circumstances, a remand may be appropriate and reversal for such error might be unnecessary).

[17] " '[D]evelopmental disability' means a disability that originates before an individual attains age 18, continues, or can be expected to continue, indefinitely and constitutes a substantial handicap for the individual, and shall not include other handicapping conditions that are solely physical in nature. . . . [T]his term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include handicapping conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals, but shall not include other handicapping conditions that are solely physical in nature." (§ 1370.1, subd. (a)(1)(H).)

suffered from a developmental disability, and specifically testified defendant was not suffering from a thought disorder. Neither Dr. Kaufman's testimony nor the testimony of defendant's family members and former teachers revealed any information suggesting defendant's present incompetence to stand trial. Defense counsel acknowledged in his argument in summation that defendant was not mentally retarded. "When the trial court's declaration of a doubt is discretionary, it is clear that 'more is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis *with little reference to defendant's ability to assist in his own defense* [citation].' " (*Welch, supra,* 20 Cal.4th at p. 742, italics added.) On the record before us, we cannot conclude the court abused its discretion by failing to declare a doubt as to defendant's competence to stand trial.

Defendant's additional claim that the trial court's failure to declare a doubt and order a competency hearing deprived him of due process of law under the Fourteenth Amendment is without merit, given we have concluded the trial court did not abuse its discretion by failing to declare a doubt as to defendant's competency.

### 4. *Alleged Prosecutorial Misconduct*

Defendant contends that the prosecutor repeatedly engaged in misconduct during his summation at the penalty phase in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, compelling reversal of the death judgment. Except where noted, however, he made no objection at trial as to any of the alleged instances of misconduct. Based on the record, he fails to qualify for an exception to the general rule requiring both an objection and request for admonition. (*Frye, supra,* 18 Cal.4th at pp. 969–970, citing *Hill, supra,* 17 Cal.4th at pp. 820–821.) Thus, these claims of misconduct are forfeited.

Further, assuming defendant's federal constitutional claims were properly preserved for review (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133) for each instance of misconduct to which defendant objected, they are without merit because we conclude that no misconduct occurred or that any misconduct was harmless.

a) *Alleged* Boyd *Error*

Evidence of a defendant's background and character is admissible only to mitigate the gravity of the crime pursuant to section 190.3, factor (k); the prosecutor may not argue such evidence should be considered in aggravation. (*People v. Lucas* (1995) 12 Cal.4th 415, 494 [48 Cal.Rptr.2d 525, 907 P.2d 373], citing *People v. Boyd* (1985) 38 Cal.3d 762, 775–776 [215 Cal.Rptr. 1, 700 P.2d 782].) The prosecutor, however, may present evidence of the defendant's background and character in rebuttal. (*People v. Avena* (1996) 13 Cal.4th 394, 439 [53 Cal.Rptr.2d 301, 916 P.2d 1000].)

Defendant claims the prosecutor violated *Boyd* when he argued the following during his penalty phase closing argument: (1) evidence that defendant had rejected the training, teaching, and moral upbringing provided by his family did not extenuate the gravity of his offenses; (2) evidence that his father had difficulty coping with his experience in Vietnam neither excused nor mitigated his offenses; (3) Dr. Kaufman's testimony established that "defendant . . . is a person who can work, who could have worked, who could have controlled his life"; (4) evidence that defendant was uncontrollable, had a probation officer assigned to him at the age of 11, and was physically violent with his mother was not mitigating; (5) although some evidence showed that defendant did not perform well academically and fought in school, other evidence showed that he performed satisfactorily in school when he applied himself; and (6) evidence of defendant's low intelligence and family background was not extenuating because he rejected help from those who tried to prevent him from becoming a career "gangster."[18]

We disagree. The prosecutor did not argue that the jury should consider mitigating defense evidence in aggravation. " 'A prosecutor does not

---

[18] Defendant also claims the following as a separate instance of *Boyd* error: During his discussion of the mitigating factors listed under section 190.3, the prosecutor read the jury the definition of factor (b), unadjudicated criminal conduct, and stated: "Steven Ross was our evidence" and then stated, *"What about the evidence from the defense case, that the defendant would instigate fights in school with other kids—"*

Defense counsel immediately objected to this argument on the ground it was "improper" because the only evidence admissible under section 190.3, factor (b) involved the Steven Ross incident. The trial court overruled counsel's objection, stating it was unsure why the prosecutor referenced the evidence of defendant's fighting in school. The prosecutor then continued to discuss the factors in mitigation. Based on this record, we cannot conclude the prosecutor's reference to defendant's school fighting constituted *Boyd* error. Defendant's claim on this ground fails.

mischaracterize such evidence [offered in mitigation] by arguing it should not carry any extenuating weight when evaluated in a broader factual context. We have consistently declined to criticize advocacy of this nature.' " (*People v. Sims* (1993) 5 Cal.4th 405, 464 [20 Cal.Rptr.2d 537, 853 P.2d 992], quoting *People v. Cox* (1991) 53 Cal.3d 618, 683 [280 Cal.Rptr. 692, 809 P.2d 351].)

### b) *Alleged* Davenport *Error*

■■■ A prosecutor may not argue that the absence of evidence of a mitigating factor may be considered as a factor in aggravation. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1034 [254 Cal.Rptr. 586, 766 P.2d 1]; *People v. Davenport* (1985) 41 Cal.3d 247, 289–290 [221 Cal.Rptr. 794, 710 P.2d 861].) Defendant acknowledges that the prosecutor made no direct statements contrary to *Davenport*, but nonetheless argues the prosecutor violated the "spirit" of *Davenport* on eight occasions because he invited jurors to infer that they should weigh the absence of mitigating factors against defendant.[19]

We disagree. Each claim fails on the merits, as no reasonable juror would have understood the prosecutor's remarks as suggesting the absence of a mitigating factor should be considered a factor in aggravation.

### c) *Alleged Misleading Statements*

■■■ Section 190.3, factor (k), expressly allows the jury to consider any circumstance that extenuates the gravity of the crime "even though it is not a legal excuse for the crime." Defendant claims that during his penalty phase closing argument, the prosecutor repeatedly presented jurors with a distorted picture of the deliberative process by stating the following evidence should be disregarded because it did not "excuse" or provide "justification" for the crimes: (1) the difficulties defendant's father experienced in returning from Vietnam; (2) that defendant's father lived with his parents in Alabama; (3) defendant's "out of control" behavior as a youth; and (4) defendant's low intelligence.

---

[19] For example, regarding section 190.3, factor (d)—whether defendant committed the offense while he was under the influence of extreme mental or emotional disturbance— defendant claims the prosecutor improperly argued he was suffering no mental or emotional disturbance at the time of the offenses, as follows: "There is no such evidence of that, none whatsoever. The evidence at least on the 29th of January was Patrick Jackson said something like what are you doing, what are you doing. And he and the defendant went back and changed cars, took Patrick's car and went out to the Heritage Inn and slept. And Patrick Jackson woke him up the next morning, and that this is the evidence that you have."

Each claim is without merit. "Considered in their context, we do not read the prosecutor's remarks as [impliedly] equating mitigation with innocence." (*People v. Padilla* (1995) 11 Cal.4th 891, 959 [47 Cal.Rptr.2d 426, 906 P.2d 388], overruled on another point in *Hill, supra,* 17 Cal.4th at p. 823, fn. 1.) Rather, the tenor of the argument was that certain evidence offered in mitigation, such as the difficulty defendant's father had coping with his experience in Vietnam or defendant's low intelligence, did not extenuate defendant's conduct in committing three murders. Accordingly, there was no misconduct.

Further, defendant is incorrect in asserting that the jury was not instructed that mitigating evidence did not have to rise to the level of an excuse or justification. The trial court instructed that a "mitigating circumstance is any fact, condition or event which as such, *does not constitute a justification or excuse for the crime in question,* but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." (Italics added.)

### d) *Alleged* Caldwell *Error*

In *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], "the prosecutor argued to the jury that theirs was not the final decision as to life or death, but that the case would be reviewed by an appellate court. The United States Supreme Court reversed the penalty, holding that 'it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' " (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1106 [259 Cal.Rptr. 630, 774 P.2d 659], quoting *Caldwell v. Mississippi, supra,* 472 U.S. 320, 328–329.) "The fact that defendant did not make a contemporaneous objection to the prosecution's remarks does not bar him from raising a claim of *Caldwell* error on appeal." (*Jackson, supra,* 13 Cal.4th at p. 1238; see *People v. Cain* (1995) 10 Cal.4th 1, 55, fn. 20 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

"In determining whether *Caldwell* error has occurred, '[w]e do not reach our conclusion based on any single statement uttered by the prosecutor. Rather, we consider the instructions of the court and the arguments of both prosecutor and defense counsel.' [Citation.] We also must consider the prosecution's statements within the overall context of its closing argument. [Citation.]" (*Jackson, supra,* 13 Cal.4th at p. 1238.)

Here, defendant alleges the following portions of the prosecutor's argument constituted *Caldwell* error: (1) "The defendant has deserved through his conduct the right to be executed like the people he executed"; (2) "Public forgiveness, meaning the jury's forgiveness of a defendant who kills . . . depreciates the value of the victim"; (3) defendant "can seek forgiveness" from the victims on "[his] judgment day"; (4) the philosopher Kant said "that even the last murderer on an empty earth needs to be punished"; and (5) pleas for sympathy or mercy should be ignored because defendant ignored Miller's pleas for defendant not to shoot him. But because, taken in context, there was no reasonable likelihood that the prosecutor's argument misled the jury regarding its responsibility in determining the appropriateness of a death sentence, we find that no *Caldwell* error was committed. (*Jackson, supra,* 13 Cal.4th at p. 1239.)

### e) *References to Deterrence and Greater Social Good*

Defendant complains that the prosecutor engaged in misconduct when he urged the jury to impose the death penalty because it would be "good for society" and "teach" society a moral lesson.

We find no misconduct. "In prior cases, we held that misconduct was committed by the prosecutor's argument that the death penalty was more effective as a deterrent than imprisonment." (*People v. Ghent* (1987) 43 Cal.3d 739, 770 [239 Cal.Rptr. 82, 739 P.2d 1250].) Here, however, the prosecutor made no express reference to deterrence. Immediately after making these remarks, the prosecutor reminded the jurors that "[y]ou are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." We conclude that it is not reasonably likely the jury understood the prosecutor as urging it to impose the death penalty for its deterrent effect.

### f) *Alleged Misstatements of Evidence*

Defendant claims the prosecutor engaged in misconduct when he argued that there was "no evidence that the defendant suffers from any mental disease" or "defect," that defendant was "an average to below average human being," and that defendant is "an average person" of "average intelligence."

We consider the prosecutor's remarks to reflect fair comment and permissible inferences based on the circumstances of the crimes and the testimony of defendant's aunt, who believed defendant was of average intelligence. (*Valdez, supra,* 32 Cal.4th at p. 134.)

Defendant also claims the prosecutor engaged in misconduct when he misstated that defendant's assault on Steven Ross occurred on February 19, 1989, instead of July 16, 1990. (*Frye, supra,* 18 Cal.4th at pp. 969–970.) But his claim is without merit because the jury would have reasonably viewed the prosecutor's misstatement as a harmless mistake, given that just moments before, he correctly recited the date of July 16, 1990, when he began his narrative of the incident.

Defendant claims the prosecutor further engaged in misconduct when he mistakenly asserted Ross testified that defendant told him, "If I had killed you, no one would know who broke into that house." Our review of the record reveals no evidence defendant made such a statement to Ross. Ross testified that after defendant hit him in his mouth in the jail cell, defendant said only that "[y]ou snitched on me and my lawyer had it in black and white and I should have killed you." Ross, however, further testified he understood defendant knew he had given the police a statement regarding the break-in and murder at the 74th Avenue house.

Moreover, defendant's reference to "my lawyer had it in black and white" implies that defendant was also aware that Ross provided the police with a statement regarding the incident. The jurors reasonably could infer that defendant knew or assumed Ross had informed the police specifically about his presence in front of the house shortly before the break-in and murder occurred. The prosecutor's statement merely reflected what the jurors easily could have inferred from the evidence. In stating that Ross testified defendant said, "If I had killed you, no one would know who broke into the house," the prosecutor made a harmless mistake. Furthermore, the jury was instructed that it must determine the facts from the evidence received during the trial and that statements made by the attorneys are not evidence. We conclude there is no reasonable possibility that the jury would have returned a verdict of life without possibility of parole in the absence of the prosecutor's error. (*People v. Brown, supra,* 46 Cal.3d at pp. 447–448.)

Finally, as he did in the guilt phase, defendant contends the prosecutor engaged in misconduct when he argued that defendant "had to reload that gun at least twice." We disagree for the same reasons we previously rejected this claim. (See *ante,* at pp. 1196–1197.)

### g) *Alleged Attacks on Defendant and Defense Counsel*

Defendant claims that the prosecutor engaged in prejudicial misconduct by characterizing him as a "gangster" and describing his conduct as "going on a terroristic rampage and murdering people over a three-week period."

▇▇▇ We conclude no misconduct occurred. "Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." (*People v. Sandoval* (1992) 4 Cal.4th 155, 180 [14 Cal.Rptr.2d 342, 841 P.2d 862] ["liar"]; *People v. Jones* (1998) 17 Cal.4th 279, 308–309 [70 Cal.Rptr.2d 793, 949 P.2d 890] ["terrorists"]; *People v. Thornton* (1974) 11 Cal.3d 738, 762–763 [114 Cal.Rptr. 467, 523 P.2d 267] ["sadist"], disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) In light of the brutal manner in which defendant hunted down his victims and shot them while they were either begging for their lives or fleeing from him, or both, the prosecutor's argument was nothing more than vigorous yet fair argument based on the evidence. In context, the jury would likely understand "gang-ster" to mean a violent street criminal and not necessarily a member of a criminal organization. The epithets played a minor role in the prosecutor's penalty phase argument viewed as a whole. Further, the jury was instructed that it was not to be influenced by prejudice against the defendant.

In his final claim of prosecutorial misconduct, defendant objected at trial to the prosecutor's remark, "What gall does the defense counsel have to say that these people's lives are less valuable than yours or mine." Defendant contends the statement prejudicially denigrated defense counsel. We disagree. There is no reasonable likelihood that the jurors understood the remarks to be a personal attack on counsel.

### 5. *CALJIC No. 8.85*

#### a) *Section 190.3, factor (a)*

The jury convicted defendant of three counts of first degree murder and found true two robbery-murder special circumstances as well as the multiple-murder special circumstance. The jury also convicted him of two counts of robbery, one count of attempted robbery, and two counts of attempted murder. Defendant asserts that CALJIC No. 8.85 impermissibly permitted the jury to consider the circumstances of the crimes for which he was convicted more than once in aggravation. (§ 190.3, factor (a) (factor (a)).) For example, he asserts, the jury's conclusion that Rivers was killed during a robbery could also be improperly considered as a fact of the robbery-murder special-circumstance finding as to that count.

Acknowledging that under our decision in *People v. Cain, supra,* 10 Cal.4th at page 68, the trial court is not obligated, on its own motion, to give

a no "double-counting" instruction, defendant asks that we reconsider that holding but offers no persuasive reason to do so. In the alternative, defendant contends that because portions of the record regarding the parties' discussion of the jury instructions before the trial court are missing, it cannot be ascertained whether defense counsel specifically requested an instruction prohibiting the "double-counting" of aggravating factors. Since he should not be held responsible for the missing records, he argues, we should presume he requested such an instruction and reverse the death judgment pursuant to *People v. Melton* (1988) 44 Cal.3d 713, 768 [244 Cal.Rptr. 867, 750 P.2d 741].

We agree that defendant should be given the benefit of the doubt as to any instructions missing from the record and presume the issue is preserved for appeal. Even assuming an appropriate request, however, reversal is not mandated.

The trial court instructed the jury with CALJIC No. 8.85 as follows: "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case . . . . You shall consider, take into account, and be guided by the following factors, if applicable. Some of these factors may be inapplicable because they were not shown by the evidence in this case. The factors you may consider are as follows: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true."

We stated in *People v. Melton, supra,* 44 Cal.3d 713, "The literal language of [factor] (a) presents a theoretical problem . . . since it tells the penalty jury to consider the 'circumstances' of the capital crime *and* any attendant statutory 'special circumstances.' Since the latter are a subset of the former, a jury given no clarifying instructions might conceivably double-count any 'circumstances' which were also 'special circumstances.' On defendant's request, the trial court should admonish the jury not to do so. [¶] *However, the possibility of actual prejudice seems remote . . . ." (Id.* at p. 768, second italics added.)

"In reviewing [a] purportedly erroneous instruction[], 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Frye, supra,* 18 Cal.4th at p. 957.) In this context, "[w]e have . . . recognized repeatedly that the absence of an instruction cautioning against double

counting does not warrant reversal in the absence of any misleading argument by the prosecutor." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1180 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

Here, the prosecutor said nothing misleading to the jury, and defendant does not point to any improper argument. (See *People v. Barnett, supra,* 17 Cal.4th at p. 1180.) Consequently, based on the record, there is no reasonable likelihood that the jury unconstitutionally applied CALJIC No. 8.85.

■ Defendant further contends that the assertedly erroneous language of CALJIC No. 8.85 violated his rights to due process, a fair penalty determination, and equal protection under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, respectively. Assuming these claims were properly preserved for review (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), they are meritless because we have concluded the language of CALJIC No. 8.85 is not erroneous and does not unduly encourage the double or multiple counting of aggravating factors.

### b) *Additional Challenges to CALJIC No. 8.85*

■ Defendant asserts various challenges to CALJIC No. 8.85 that we previously have considered and rejected. ■ Specifically, CALJIC No. 8.85 is not unconstitutionally vague (*Farnam, supra,* 28 Cal.4th at p. 192); the jury's consideration of unadjudicated criminal conduct pursuant to section 190.3, factor (b), does not offend the Fifth, Sixth, Eighth, or Fourteenth Amendments to the federal Constitution or analogous provisions of the California Constitution (*People v. Brown* (2003) 31 Cal.4th 518, 570–571 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; *People v. Medina* (1990) 51 Cal.3d 870, 906–907 [274 Cal.Rptr. 849, 799 P.2d 1282] [no equal protection violation]); and the trial court's failure to delete inapplicable factors from the instruction or identify factors as aggravating or mitigating does not violate the Fifth, Eighth, or Fourteenth Amendments (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1150–1151 [124 Cal.Rptr.2d 373, 52 P.3d 572]). We are not persuaded to reconsider these decisions on the basis of defendant's "empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross examination." (*Welch, supra,* 20 Cal.4th at p. 773.)

### 6. *Miscellaneous Challenges to CALJIC No. 8.88*

■ Defendant claims various aspects of CALJIC No. 8.88 violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

We previously have considered and rejected each of these challenges, and do so again now, as defendant offers no persuasive reason to reconsider our prior decisions: The phrase "so substantial" in the last paragraph of the instruction properly instructs the jury that aggravating circumstances must outweigh mitigating ones (*Medina, supra,* 11 Cal.4th at p. 781); the instruction does not erroneously "impl[y] that a single mitigating circumstance could not outweigh any and all aggravating circumstances and hence could not support a decision that death was not the appropriate punishment" (*Berryman, supra,* 6 Cal.4th at pp. 1099–1100, overruled on another ground in *Hill, supra,* 17 Cal.4th at p. 823); the instruction adequately defines a mitigating circumstance (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180 [113 Cal.Rptr.2d 827, 34 P.3d 937]); and the trial court has no duty to instruct the jury on the term "life without possibility of parole" (*Hawthorne, supra,* 4 Cal.4th at pp. 75–76).

### 7. *Automatic Application for Modification of the Verdict*

Defendant claims that the trial court prejudicially erred in denying his automatic application for modification of the penalty verdict by failing to apply the correct standard of review. In addition, he contends the trial court's conclusions regarding the factors in aggravation and mitigation were not supported by the evidence.

In ruling on an automatic application for modification, the trial court "shall review the evidence" and "shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (§ 190.4, subd. (e).) "[T]he trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict.* [Citations.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627].) In ruling on the application for verdict modification, the trial court must also "specify reasons for denying modification sufficient 'to assure thoughtful and effective appellate review.' " (*People v. Rodriguez* (1986) 42 Cal.3d 730, 794 [230 Cal.Rptr. 667, 726 P.2d 113].)

"On appeal, we subject a ruling on a verdict-modification application to independent review." (*Clair, supra,* 2 Cal.4th at p. 689.) "Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty." (*People v. Mickey* (1991) 54 Cal.3d 612, 704 [286 Cal.Rptr. 801, 818 P.2d 84].)

Here, in its formal ruling, the trial court reviewed the jury's verdict, count by count, and then it summarized the requirements of section 190.4, subdivision (e). Next, the court reviewed the requirements of our holding in *People v. Rodriguez, supra,* 42 Cal.3d at page 793, stating that it was mindful of its duty to "make an independent determination whether imposition of the death penalty upon the defendant is appropriate in light of the relevant evidence and the applicable law." The court understood that in order to make such a determination, it had "to review the evidence to determine where in its independent judgment the weight of the evidence supports the jury's verdict."

Thereafter, the court announced that it had "reviewed the presence or absence of each aggravating and mitigating circumstance listed in section 190.3 and specifically agree[d] that the jury's assessment that the circumstances in aggravation outweigh the circumstances in mitigation [was] supported by the weight of the evidence." The court further found "that the evidence supporting the truth of the first, second, and fifth special circumstances is overwhelming and undisputed in that the jury's assessment that the evidence in aggravation outweighs the evidence in mitigation so as to support the selection of the death penalty as the appropriate penalty is overwhelmingly supported by the weight of the evidence."

The court, based on its independent examination and review of all the evidence as well as its personal notes, was satisfied beyond a reasonable doubt that each verdict was correct. The court reviewed each of the specific aggravating and mitigating circumstances listed in section 190.3 and made independent findings as to each circumstance. The trial court independently concluded "the circumstances in aggravation are so substantial in comparison with the circumstances in mitigation that death is warranted," and formally denied defendant's modification motion.

Defendant argues that the trial court applied the wrong standard when it reviewed the penalty phase evidence because it stated it reviewed the evidence to determine whether "the jury's assessment that the circumstances in aggravation outweigh the circumstances in mitigation is supported by the weight of the evidence." To the contrary, the trial court clearly understood its duty to independently reweigh all of the aggravating and mitigating evidence to determine whether, in its independent judgment, the weight of the evidence supports the jury's verdicts. Accordingly, this claim fails.

Defendant's attacks on the trial court's specific findings regarding the factors in aggravation and mitigation fare no better. For example, defendant argues that the evidence does not support the trial court's independent conclusions regarding the circumstances of the crimes (factor (a)) that defendant killed Terry Rivers during the commission of a robbery and in a

"senseless and coldblooded" manner; that defendant personally used a handgun in shooting Rivers in the back of his head; that "the killing of Sylvester Davis was senseless and pitiless"; that defendant "hunted down Sylvester Davis who was attempting to flee the scene"; and that defendant was the sole perpetrator of the crimes. But defendant's complaint is not that the trial court's findings are unsupported by the evidence. Rather, defendant's complaint is that the trial court viewed the evidence differently than he does and drew inferences unfavorable to him.

Although defendant contends certain findings by the trial court regarding mitigating circumstances are unsupported by the evidence, in each instance, defendant merely disagrees with the *weight* the trial court accorded the purportedly mitigating evidence. Thus: (1) the trial court found there were no circumstances that could have provided a moral justification or extenuation for his conduct (§ 190.3, factor (f)) despite Jackson's testimony defendant was the victim of a robbery on 89th Avenue and "apparently chased down Frazier and Fite in an attempt to recover money that had been taken from him"; (2) the court concluded defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not impaired as the result of a mental disease or defect or the effects of intoxication (§ 190.3, factors (d), (h)) despite evidence that defendant's IQ was on the borderline of mental retardation, that he suffered from an organic brain disorder, and that his neuropsychological functioning was "highly impaired"; and (3) the court concluded there were no other extenuating factors or any sympathetic or other aspects of the defendant's character or record that would provide a basis for a sentence of life without possibility of parole (§ 190.3, factor (k)) despite evidence of defendant's poor academic skills, borderline retardation, and drug use since the age of 13.

Contrary to defendant's argument, the record establishes that the court did consider all pertinent penalty phase evidence, including the mitigating evidence offered by defendant. However, it found this evidence insufficient to void the jury's death penalty determination. In any event, this court "may not interpose or substitute its conclusion as to the relative balance of aggravating and mitigating circumstances for that of the trier of fact. Our inquiry must end with the finding that all constitutional and statutory considerations have been observed." (*Hawthorne, supra,* 4 Cal.4th at p. 80.)

Defendant additionally claims that the trial court's failure to independently reweigh the penalty phase evidence in evaluating his automatic application for modification of the verdict constituted a violation of his "constitutionally protected liberty interest" in having the trial court follow required procedures in determining whether the death penalty should be imposed. (See *Hicks v. Oklahoma, supra,* 447 U.S. at p. 346; *Walker v. Deeds* (9th Cir. 1994) 50 F.3d

670, 672–673.) He further claims the trial court's failure to properly conduct its review also resulted in an arbitrary and capricious imposition of the death penalty in violation of the Eighth Amendment to the federal Constitution. Assuming these claims were properly preserved for review (see *People v. Yeoman, supra*, 31 Cal.4th at pp. 117, 133), each of these points is without merit, given we concluded that the trial court independently reweighed all of the aggravating and mitigating evidence and otherwise properly conducted its review pursuant to section 190.4, subdivision (e).

### 8. *Appellate Delay*

Defendant contends that delays in the appellate process have deprived him of his right to counsel, denied him due process, and subjected him to cruel and unusual punishment, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

We reject each of defendant's contentions. Although we have acknowledged the possibility that "[i]n some circumstances, excessive delays in the appellate process may give rise to a denial of due process," defendant fails to show "any actual prejudice as a result of the delay, such as an impairment of grounds on appeal." (*People v. Horton* (1995) 11 Cal.4th 1068, 1141 [47 Cal.Rptr.2d 516, 906 P.2d 478]; see *United States v. Loud Hawk* (1986) 474 U.S. 302, 313–314 [88 L.Ed.2d 640, 106 S.Ct. 648]; *Coe v. Thurman* (9th Cir.1990) 922 F.2d 528, 530.) In addition, we rejected his earlier argument that he has suffered actual prejudice as a result of the numerous missing portions of the record. (See *ante*, at pp. 1169–1170.)

Further, "defendant fails to demonstrate that the delay inherent in the procedures by which California recruits, screens, and appoints attorneys to represent capital defendants on appeal, is not necessary to ensure that competent representation is available for indigent capital appellants. . . . [D]efendant fails to suggest any impact that the delay could have on the validity of the judgment rendered before that delay occurred." (*People v. Holt* (1997) 15 Cal.4th 619, 709 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

Finally, we previously have rejected claims that appellate delay violates the Eighth Amendment's prohibition against cruel and unusual punishment and that a death sentence cannot serve any legitimate penological purpose after such extraordinary delay. (See, e.g., *People v. Ochoa* (2001) 26 Cal.4th 398, 462–463, & fn. 18, 464 [110 Cal.Rptr.2d 324, 28 P.3d 78].) Defendant offers no persuasive reason to revisit our prior decisions, and we decline to do so.

### 9. *Proportionality Review*

Defendant claims that his death sentence is disproportionate to his culpability and that its imposition in this case would violate article I, section 17 of the California Constitution and the Eighth Amendment to the United States Constitution. In support, he relies on his age (20 years old), low IQ (75), deprived childhood, family instability, lifelong learning disabilities, "probable organic mental disorder not otherwise specified," drug addiction, and lack of a violent criminal background. He also stresses that the evidence was insufficient to sustain his convictions for the Rivers and Davis murders.

 We do undertake such a review on request. (*People v. Cleveland* (2004) 32 Cal.4th 704, 768 [11 Cal.Rptr.3d 236, 86 P.3d 302] (*Cleveland*).) " 'The cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution prohibits the imposition of a penalty that is disproportionate to the defendant's "personal responsibility and moral guilt." [Citations.] Article I, section 17, of the California Constitution separately and independently lays down the same prohibition.' [Citations.]" (*People v. Marshall* (1990) 50 Cal.3d 907, 938 [269 Cal.Rptr. 269, 790 P.2d 676].) "To determine whether a sentence is cruel or unusual [under the California Constitution] as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], or, stated another way, that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*People v. Hines* (1997) 15 Cal.4th 997, 1078 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Here, defendant, at the age of 20, acted alone when he ruthlessly and fatally shot three men over a three-week period. The first was shot in the back of his head as he tried to run away from defendant; the second was shot in the back as he begged for his life while down on his hands and knees; and the third was shot in his lower back after he jumped out of a bedroom window attempting to escape from the house in which defendant went on a shooting rampage. Two of the murders were apparently motivated by robbery, but the record contains no explanation for the third murder. Defendant also attempted to murder two others. Although defendant offered some evidence he suffers from a low IQ and a "probable organic mental disorder not otherwise specified," there was no evidence that either his low IQ or the mental disorder played any role in the killings. (*People v. Lucero* (2000) 23 Cal.4th 692, 740

[97 Cal.Rptr.2d 871, 3 P.3d 248].) We agree with the trial court's finding that "the totality of the evidence of all the crimes of which the defendant was convicted in these proceedings show[s] an extreme degree of callousness and cruelty and a total disregard for human life." Based on these facts, the punishment in this case is not " 'grossly disproportionate to the defendant's individual culpability,' " nor does it " ' " 'shock[] the conscience and offend[] fundamental notions of human dignity.' " ' " (*People v. Hines, supra,* 15 Cal.4th at p. 1078.)

### 10. *Concurrent Representation by Counsel*

Defendant claims he was deprived of his right to conflict-free counsel because the attorney appointed to represent him on direct appeal was also appointed to investigate potential claims to be raised in a petition for a writ of habeas corpus, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, 17, and 24 of the California Constitution.[20] He asserts that reversal of the judgment is mandated.

Defendant submits that the inherent conflict that arises when the same attorney represents a defendant at trial and on direct appeal (see *People v. Bailey* (1992) 9 Cal.App.4th 1252, 1254–1255 [12 Cal.Rptr.2d 339]) similarly arises when the same attorney represents a defendant on direct appeal and in habeas corpus proceedings, because habeas corpus counsel must investigate appellate counsel's performance and, if necessary, present claims of ineffective assistance of counsel.

"Defendant's argument explains why habeas corpus counsel might potentially be burdened by a conflict of interest if placed in the position of urging counsel's own incompetence as appellate counsel, but it does not explain how this dual appointment could in any way interfere with counsel's effective representation on the appeal. Thus, defendant has failed to demonstrate that appellate counsel is burdened by an actual or potential conflict of interest." (*Kipp, supra,* 26 Cal.4th at p. 1139, fn. omitted.)

Further, "[d]efendant's claim that habeas corpus counsel is burdened by a conflict of interest is not cognizable . . . on direct appeal. . . . [I]t lacks merit in any event as defendant has no right under the federal Constitution to the effective assistance of counsel in a state habeas corpus proceeding (*Coleman v. Thompson* (1991) 501 U.S. 722, 756–757 [115 L.Ed.2d 640, 111 S.Ct. 2546]; *Murray v. Giarratano* (1989) 492 U.S. 1, 10 [106 L.Ed.2d 1, 109

---

[20] "This court no longer routinely appoints the same attorney to represent a defendant under judgment of death on both the automatic appeal and on a petition for a writ of habeas corpus." (*Kipp, supra,* 26 Cal.4th at p. 1139, fn. 4.)

S.Ct. 2765] (plur. opn. of Rehnquist, C. J.); *id.* at pp. 14–15 (conc. opn. of Kennedy, J.)), although the alleged deficiencies of habeas corpus counsel, whether the result of a conflict of interest or some other cause, may be considered when determining the applicability of procedural bars (*In re Sanders* (1999) 21 Cal.4th 697, 719 [87 Cal.Rptr.2d 899, 981 P.2d 1038]). Thus, the appointment of a single attorney to represent defendant on direct appeal and on any petition for writ of habeas corpus does not violate the state or federal Constitution." (*Kipp, supra,* 26 Cal.4th at pp. 1139–1140.)

### 11. *Miscellaneous Constitutional Challenges*

Defendant asserts various challenges to California's death penalty law under the Eighth and Fourteenth Amendments to the United States Constitution. We have previously considered and rejected each of these challenges, and defendant offers no persuasive reason to reconsider our prior decisions. "Thus, the California death statute is not unconstitutional in failing to require the jury to make [written] findings of the factors it finds in aggravation and mitigation [citation], require intercase or intracase proportionality review [citations], delete inapplicable factors [from CALJIC No. 8.85] [citation], identify which factors are aggravating and which are mitigating [citation], require that aggravating factors be proven beyond a reasonable doubt, require that the aggravating factors must outweigh the mitigating factors beyond a reasonable doubt, require that death must be found to be the appropriate penalty beyond a reasonable doubt [citation], or require that there be any burden of proof [citation]. Nor are the factors a jury may consider in determining penalty, such as the circumstances of the crime, the defendant's age, or the use of the adjectives 'extreme' and 'substantial,' unconstitutionally vague. [Citations.] Nor does the prosecutorial discretion to charge special circumstances or seek the death penalty under the statute violate the federal Constitution. [Citations.] Nor does the death statute in general, or the multiple-murder special circumstance in particular, fail to narrow in a constitutionally acceptable manner the class of persons eligible for the death penalty. [Citations.]"[21] (*Box, supra,* 23 Cal.4th at p. 1217.) The trial court need not give a "presumption of life" instruction (*People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980]), nor does it err by failing to instruct that the jury must find aggravating factors unanimously (*Cleveland, supra,* 32 Cal.4th at p. 769).

---

[21] While defendant acknowledges that we have previously rejected similar arguments, he maintains that we must reconsider his argument in light of the United States Supreme Court's decisions in *Ring v. Arizona, supra,* 536 U.S. 584, and *Apprendi v. United States* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]. The *Ring* and *Apprendi* decisions, however, do not affect California's death penalty law. (See, e.g., *Cleveland, supra,* 32 Cal.4th at p. 765.)

### 12. *Method of Execution*

Pursuant to section 3604, subdivision (b), a death row inmate may elect either lethal gas or lethal injection as the method of execution; if the inmate makes no election, execution is by lethal injection. Defendant contends that the method of execution in California is unconstitutional in two respects. First, he claims that the Department of Corrections has failed to adopt standards for the administration of lethal injection as required under section 3604, in violation of his right to procedural due process under the Fourteenth Amendment to the federal Constitution. Second, defendant claims California's lethal injection method of execution violates the Eighth Amendment ban against cruel and unusual punishment.

As for defendant's first claim, he fails to establish the factual predicate upon which this claim is based. That is, he fails to show that the Department of Corrections has not complied with the mandate under section 3604 that it adopt standards for the administration of lethal injection. " ' "In any event, the claim must be rejected out of hand as a ground for reversal of the judgment of death. It bears solely on the legality of the execution of the sentence and not on the validity of the sentence itself." ' " (*People v. Samayoa, supra,* 15 Cal.4th at p. 864.)

As for defendant's second claim, death by lethal injection is not cruel or unusual punishment. (See, e.g., *People v. Samayoa, supra,* 15 Cal.4th at p. 864.)

### 13. *International Law*

Defendant contends he was denied his right to a fair trial and impartial trial in violation of customary international law as evidenced by articles 6 and 14 of the International Covenant on Civil and Political Rights as well as articles 1 and 26 of the American Declaration. "Because defendant has entirely failed to establish the predicates of his argument—that he suffered prejudicial violations of due process . . . during his trial—we have no occasion to consider whether such violations would also violate international law." (*People v. Jones* (2003) 29 Cal.4th 1229, 1268 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

### 14. *Cumulative Error*

Defendant contends "the cumulative impact of the numerous penalty phase errors requires reversal of the death penalty even if no single error does so independently." Whether considered separately or collectively, the few errors we have found were harmless, and therefore defendant's contention is without merit.

III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**BROWN, J.,** Concurring.—I write to highlight a doubt I have about our holding in *People v. Motton* (1985) 39 Cal.3d 596 [217 Cal.Rptr. 416, 704 P.2d 176] (*Motton*). In *Motton*, at page 605, we held that for purposes of a *Wheeler* analysis, Black women constitute a "cognizable group." (See *People v. Wheeler* (1978) 22 Cal.3d 258, 280 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*); see also *Batson v. Kentucky* (1986) 476 U.S. 79, 96 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*).) We have reaffirmed that holding several times in dictum (*People v. Cleveland* (2004) 32 Cal.4th 704, 734 [11 Cal.Rptr.3d 236, 86 P.3d 302]; *People v. Boyette* (2002) 29 Cal.4th 381, 422 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Garceau* (1993) 6 Cal.4th 140, 171 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People v. Clair* (1992) 2 Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705]), and relying heavily on *Motton*, the Court of Appeal has held that Black men also constitute a cognizable group. (*People v. Gray* (2001) 87 Cal.App.4th 781, 790 [104 Cal.Rptr.2d 848]; but see *United States v. Dennis* (11th Cir. 1986) 804 F.2d 1208, 1210 [rejecting *Batson* claim for failure to show "that black males . . . have been singled out for different treatment under the laws not simply as blacks, but as black males"].) I believe our analysis in *Motton* focuses too much on the principle of maximum diversity and loses sight of the underlying purpose of jury selection.

The majority opinion adequately summarizes the law applicable to *Batson/Wheeler* motions. (See maj. opn., *ante*, at pp. 1170–1174) Despite the emphasis both *Wheeler* and *Batson* placed on the exclusion of members of a "cognizable group," neither case actually defined that term. (See *Wheeler*, *supra*, 22 Cal.3d at p. 280; *Batson*, *supra*, 476 U.S. at p. 96 [using the term "cognizable racial group"].) We later made some effort to define the term in *Rubio v. Superior Court* (1979) 24 Cal.3d 93, 97–98 [154 Cal.Rptr. 734, 593 P.2d 595] (*Rubio*), and *People v. Fields* (1983) 35 Cal.3d 329, 348–349 [197 Cal.Rptr. 803, 673 P.2d 680] (*Fields*), but neither case had a majority opinion. Moreover, depending on whether the exclusion is challenged as a violation of equal protection rights (*Batson*) or the defendant's right to an impartial jury drawn from a representative cross-section of the community (*Wheeler*), or both, the question of what constitutes a cognizable group may be answered in different ways.

Most of our cases defining "cognizable group" have arisen in. the *Wheeler* context, and they focus on ensuring that no "perspective" that exists in the community at large be systematically excluded from the jury. (*Rubio, supra,* 24 Cal.3d at pp. 97–98; see also *Fields, supra,* 35 Cal.3d at p. 348.) Federal cases, on the other hand, applying equal protection law have considered whether the group has been the target of a distinct form of discrimination. In *Castaneda v. Partida* (1977) 430 U.S. 482, 494 [51 L.Ed.2d 498, 97 S.Ct. 1272], for example, the high court held that the group had to be "a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." Similarly, in *Murchu v. United States* (1st Cir. 1991) 926 F.2d 50, 54 (*Murchu*), the court stated that the moving party "must show that . . . the group [is] one the members of which are experiencing unequal, *i.e.* discriminatory, treatment, and needs protection from community prejudices."[1]

These federal definitions have the merit of narrowing the inquiry. Our cases applying *Wheeler* are so expansive in their definition of cognizable group that the possibilities are literally endless. Despite our justifiable enthusiasm to include all community perspectives in the judicial process, we must also recognize that at some point this principle clashes with the more fundamental purpose of selecting a fair and impartial jury. If we are increasingly willing to identify groups that share a common perspective and therefore can be the subject of a *Wheeler* motion, we eventually eclipse peremptory ·challenges altogether, but in California, peremptory challenges are themselves an important part of the process of ensuring a fair and impartial jury. Therefore, we cannot apply *Wheeler* so broadly that we effectively turn every peremptory challenge into a challenge for cause.

The problem of an endless proliferation of cognizable groups is exacerbated by the possibility of cross-categories—that is, the subgroups that are constructed from the intersection of two or more cognizable groups. If we recognize cross-categories as distinct cognizable groups, then the number of cognizable groups expands geometrically: two cognizable groups give rise to four possible subgroups, three cognizable groups give rise to eight possible subgroups, four groups give rise to 16, etc. Logic, as well as the unusual

---

[1] In *Murchu, supra,* 926 F.2d at page 54, the court stated the entire test as follows: "To establish membership in a 'cognizable group' for *Batson* purposes, a defendant must show that (1) the group is definable and limited by some clearly identifiable factor, (2) a common thread of attitudes, ideas or experiences runs through the group, and (3) a community of interests exists among the group's members, such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process. A further ingredient of cognizability is that the group be one the members of which are experiencing unequal, *i.e.* discriminatory, treatment, and needs protection from community prejudices." (See also *United States v. DiPasquale* (3d Cir. 1988) 864 F.2d 271, 277; *United States v. Sgro* (1st Cir. 1987) 816 F.2d 30, 33.)

prophylactic remedy that *Wheeler* and *Batson* created, dictate that, for a cross-category to constitute a separate cognizable group, there must be some indication that the two categories operate in conjunction, generating a distinct synergy of prejudice or group bias. With that point in mind, the issue in *Motton* and in this case becomes clear. Before we can find that Black women are a cognizable group, we have to find that, in a sufficient number of cases to justify a *Batson/Wheeler* remedy, gender is not the basis of group discrimination, nor is ethnicity that basis, but rather "ethno-gender"—the conjunction of a person's gender and ethnicity—is the basis of group discrimination. In other words, we have to find that, from the perspective of jury selection, being a Black woman is significantly different from being Black and being a woman. Moreover, we have to make that finding in an evidentiary vacuum; declaring it to be so without the benefit of hearings, formal studies, expert testimony, or even anecdotal evidence.

In *Motton, supra,* 39 Cal.3d at page 605, we defined a cognizable group as any group that has a "definite composition" and " 'a basic similarity in attitudes or ideas or experience. . . .' " (See also *Rubio, supra,* 24 Cal.3d at pp. 97–98; *Adams v. Superior Court* (1974) 12 Cal.3d 55, 60 [115 Cal.Rptr. 247, 524 P.2d 375].) That standard is too broad because in many cases a similarity in attitudes actually *justifies* the categorical exclusion of a group of jurors—for example, when the attitudes in question suggest a specific inability to be impartial. (See, e.g., *Rubio,* at pp. 99–100 [felons are not a cognizable group]; *People v. Turner* (1984) 37 Cal.3d 302, 313–315 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on another ground by *People v. Anderson* (1987) 43 Cal.3d 1104, 1115 [240 Cal.Rptr. 585, 742 P.2d 1306] [persons with reservations about capital punishment are not a cognizable group].) Instead, as noted, the standard must focus on the purpose of the inquiry, which is to ensure a fair and impartial jury. (*Batson, supra,* 476 U.S. at p. 87; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.)

I would not reject, as a matter of law, the possibility that Black women might be the victims of a unique type of group discrimination justifying their designation as a cognizable group, but I see no evidentiary basis in *Motton* for us to have made a judicial finding to that effect, binding in all jury selection proceedings, and I see no such evidentiary basis in this case either.

The invidious effect of our holding in *Motton* is that the law now memorializes a pernicious stereotype it is trying to combat, and it does so without anyone even establishing, as a factual matter, that the stereotype

preexisted our holding. In this way, we created the stereotype, pretending to destroy it. Here, of course, we can avoid the issue by finding no purposeful discrimination, but the wisdom and continuing validity of our holding in *Motton* remain unresolved.